1

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE CENTRAL DISTRICT OF ILLINOIS
 2                    URBANA DIVISION

 3

 4   UNITED STATES OF AMERICA,          )
                                        )
 5                  Plaintiff,          )
                                        )
 6          vs.                         ) No. 06-20074
                                        )
 7   DANNY W. ORR,                      )
                                        )
 8                  Defendant.          )

 9

10

11              SENTENCING HEARING
     BEFORE THE HONORABLE CHIEF JUDGE MICHAEL P. McCUSKEY
12

13

14

15         PARTIAL TRANSCRIPT OF PROCEEDINGS
                    MAY 16, 2008
16                  11:00 A.M.

17

18

19       Jill Nicole Stevens:  CSR # 084-004212

20     Area Wide Reporting and Video Conferencing
                 301 West White Street
21           Champaign, Illinois  61820
                  (800) 747-6789
22

23

24

25
```

2

```
 1                            INDEX

 2

 3   APPEARANCES:

 4   For the United States:
             Timothy A. Bass
 5           Assistant U.S. Attorney
             618 South Sixth Street
 6           Springfield, Illinois  62701-1806
             (217) 492-4450
 7
     For the Defendant:
 8           Sheldon Sorosky
             Kaplan & Sorosky, Ltd.
 9           Attorneys at Law
             158 West Erie
10           Chicago, Illinois  60610
             (312) 640-1776
11
     Also Present:
12           Danny W. Orr, Defendant
             Karmen L. Coates, Probation Officer
13           Ferne Orr
             Judy Logan
14

15

16

17

18

19

20

21

22

23

24

25
```

1                      INDEX - CONTINUED

2

3   AGGRAVATION:                                    PAGE

4   WITNESS:   SPECIAL AGENT MICHAEL MITCHELL

5           By Mr. Bass                             16

6

7   MITIGATION:

8   WITNESS:  FERNE ORR

9           By Mr. Sorosky                          27

10          By Mr. Bass                             43

11
    WITNESS:  JUDY LOGAN
12
            By Mr. Sorosky                          52
13

14
    RECOMMENDATIONS:
15
            By Mr. Bass                             60
16
            By Mr. Sorosky                          65
17

18
    ALLOCUTION:
19
            By Mr. Sorosky/Mr. Orr                  70
20

21

22

23

24

25

                                                    4

1                      11:06 a.m.

2          THE COURT:  This is the case of the

3    United States of America, Plaintiff, versus Danny W.

4    Orr, Case Number 06-20074.

5          Present in open court is the Defendant,

6    Danny W. Orr, accompanied by his attorney, Sheldon

7    Sorosky; the United States of America, represented

8    by its Assistant U.S. Attorney, Timothy A. Bass.

9          On November 15th, 2006, a grand jury

10   indicted Danny W. Orr on two counts.  Count 1 was

11   from on or about July 19, 2006 and continuing to on

12   or about September 11, 2006, in the Central District

13   of Illinois and elsewhere, the Defendant, Danny W.

14   Orr, used a facility and means of interstate

15   commerce, including internet communications, a means

16   of interstate commerce, to knowingly attempt to

17   persuade, induce, entice and coerce a minor who had

18   not attained the age of 18 to engage in sexual

19   activity for which the Defendant could have been

20   charged with a criminal offense, all in violation of

21   Title 18 United States Code Section 2422(b).

22          Count 2 was on or about September 5, 2006,

23   in the Central District of Illinois and elsewhere,

24   the Defendant, Danny W. Orr, knowingly and

25   intentionally attempted to persuade, induce, entice

5

1    and coerce a minor who had not attained the age of

2    18 to travel in interstate commerce to engage in

3  sexual activity for which the Defendant could have

4  been charged with a criminal offense, all in

5  violation of Title 18 United States Code

6  Section 2422(a).

7         Mr. Orr pled not guilty to those two

8  counts, demanded a trial by jury and, on

9  January 31st, 2008, the Defendant was found guilty

10  by a jury as to Counts 1 and 2 of the indictment.

11  The Court ordered probation to prepare a

12  pre-sentence report and set the matter for

13  sentencing today.

14         Pursuant to the direction of the Court,

15  Karmen L. Coates, who is present today, prepared a

16  pre-sentence investigation report, which was first

17  prepared on April 7th, 2008.  And, Ms. Coates, did

18  you mail a copy to Mr. Bass, Mr. Sorosky and

19  Mr. Orr?

20         MS. COATES:  Yes, Your Honor.

21         THE COURT:  In the pre-sentence

22  investigation report, Timothy A. Bass advised in a

23  letter, dated May 5th, 2008, that the United States

24  had received and reviewed the pre-sentence report

25  and have no objections to it.  Mr. Bass, is that

1  still correct today?

2         MR. BASS:  It is, Your Honor, but I do

3  have a position to take with respect to the

4  objection that may be appropriate to --

5            THE COURT:  Okay.

6            MR. BASS:  -- raise now.

7            THE COURT:  You may proceed.

8            MR. BASS:  Your Honor, the objection that

9  the Defendant has to the pre-sentence report relates

10  to Paragraphs --

11            THE COURT:  -- 35 and 36, at least is what

12  Ms. Coates shows on Page 19, the five-level

13  enhancement --

14            MR. BASS:  The five-level enhancement in

15  Paragraph 36, which resulted in an offense level of

16  43 and a guideline range of life.  The Government is

17  not going to recommend a life sentence, Your Honor,

18  so in light of that, it seems inefficient to

19  litigate the issue of the facts of Paragraph 36 for

20  purposes of calculating the guideline range.

21            We do intend to present evidence on that

22  with respect to evidence in aggravation, but the

23  Government would have no objection to the Court

24  striking the five-level enhancement and making the

25  revised offense level 38 and a guideline range of

7

1  235 to 293 months.

2            THE COURT:  Well, in doing that, do you

3  want me to show that Probation and the Government

4  withdraw the five-level enhancement or how do you

5    want --

6              MR. BASS:  I think that would be

7    appropriate, Your Honor.  The Government will

8    withdraw pursuit of the five-level enhancement for

9    purposes of the guideline calculation, but we do

10   intend to rely on that for purposes of aggravation.

11             THE COURT:  Mr. Sorosky, any objections to

12   the withdrawal?

13             MR. SOROSKY:  No, we have no objection to

14   that, certainly.

15             THE COURT:  Okay.  I've got to write it

16   down and then I'll read it into the record.

17             (Pause.)

18             Okay.  Let's go through this, Ms. Coates.

19   I have written now on Page 22 under D, which is the

20   objection raised by Mr. Orr and Mr. Sorosky to

21   Pages 9 and 10, Paragraphs 35 and 36, I have struck

22   Box D.

23             The Government and Probation withdraw the

24   five-level enhancement set forth in Paragraph 36,

25   Page 10, which reduces the total offense level in

                                                      8

1    Paragraph 37 to Offense Level 38; thus,

2    Paragraph 72, Page 16, reflects a total offense

3    level of 38 with a Criminal History Category 1 for

4    an advisory guideline range of 235 to 293 months.  I

5    think that's in effect what you said, Mr. Bass.

6           MR. BASS:  Yes, Your Honor.

7           THE COURT:  Now we have to look as to

8    whether that changes any other paragraphs,

9    Ms. Coates, because I've talked about now changing

10   Paragraph 36, 37 and now 72.  I don't know if that

11   changes the fine range or anything else.

12          MS. COATES:  It does not.  38 and above is

13   the same fine range.

14          THE COURT:  So those are the only

15   modifications I have to make in light of that

16   change?

17          MS. COATES:  That is correct.

18          THE COURT:  Okay.  And, Mr. Sorosky,

19   you've received and reviewed the pre-sentence

20   report; is that correct?

21          MR. SOROSKY:  Yes.

22          THE COURT:  That was the objection that

23   you had made which has now been withdrawn; is that

24   correct?

25          MR. SOROSKY:  Yes.

9

1           THE COURT:  Did you have any other

2    objections to the pre-sentence report?

3           MR. SOROSKY:  No.

4           THE COURT:  You've met and reviewed the

5    report with Mr. Orr and discussed it with him?

6           MR. SOROSKY:  Yes.

7          THE COURT:  Mr. Orr, did you receive the

8  pre-sentence report?

9          DEFENDANT ORR:  Yes, I did, sir.

10          THE COURT:  Did you have a chance to

11  discuss it with Mr. Sorosky?

12          DEFENDANT ORR:  Briefly.

13          THE COURT:  And you know that he filed an

14  objection that has just been resolved, which

15  certainly is to your benefit; and I'm assuming that

16  was also one of the objections you had.  Is that

17  correct?

18          DEFENDANT ORR:  Yes, Your Honor.

19          THE COURT:  Did you have any other

20  objections to the pre-sentence report that would

21  affect the advisory guideline range -- of course, it

22  wouldn't affect your criminal history because that's

23  one -- or the statutory sentencing factors?

24          Because you have a right to have

25  objections made even if Mr. Sorosky doesn't because

                                                      10

1  they'll affect the advisory sentencing guidelines,

2  the statutory sentencing factors, because you will

3  be sentenced under the statutory factors in

4  18 United States Code Section 3553(a).

5          DEFENDANT ORR:  There were -- not at this

6  time, Your Honor.

7          THE COURT:  So you're indicating that we

8  may proceed with sentencing without any further

9  objections being heard from you or Mr. Sorosky; is

10  that correct?

11          DEFENDANT ORR:  Yes.

12          THE COURT:  Anybody force you to say that?

13          DEFENDANT ORR:  No, sir.

14          THE COURT:  Threaten you in any way?

15          DEFENDANT ORR:  No, sir.

16          THE COURT:  Promise you any specific

17  sentence to indicate that you would not have further

18  objections?

19          DEFENDANT ORR:  No, sir.

20          THE COURT:  Okay.  The Court finds that

21  the pre-sentence report has been received by

22  Mr. Bass, by Mr. Sorosky and Mr. Orr; that the sole

23  objection that Mr. Sorosky and Mr. Orr had to the

24  five-level enhancement that would have placed the

25  Defendant in an Offense Level 43, Criminal History

11

1  Category 1 and the range of life has been removed by

2  withdrawing that five-level enhancement.  As a

3  result, the Defendant has a total offense level of

4  38, criminal history category of one and an advisory

5  guideline sentencing range of 235 to 293 months.

6          Ms. Coates, do you agree with that

7  calculation?

8          MS. COATES:  Yes, Your Honor.

9            THE COURT:  Do you agree with that also,

10   Mr. Bass?

11            MR. BASS:  Yes, Your Honor.

12            THE COURT:  And, Mr. Sorosky?

13            MR. SOROSKY:  Yes, we -- yes.

14            THE COURT:  The Court has had a chance to

15   review -- now that there are no objections to the

16   pre-sentence report and we have modified

17   Paragraph 36, 37 and 72 in accordance with the

18   withdrawal of the five-level enhancement, the Court

19   has reviewed the remaining portion of the

20   pre-sentence report as well as the modifications,

21   finds that it has been properly prepared pursuant to

22   the advisory sentencing guidelines, that the Court

23   has adopted the modified advisory guidelines with

24   the Offense Level 38, Criminal History Category 1.

25   There are no objections.  The Court finds it has

                                                   12

1    been properly prepared, adopts it, Pages 1 through

2    Paragraph 90 -- Pages 1 through 18, Paragraphs 1

3    through 90 as modified.  The Court does so by a

4    preponderance of the evidence.

5            Based on the jury's conviction, which the

6    Court has affirmed and denied the motion for a new

7    trial, the Defendant faces ten years to life under

8    the statute on Count 1, so it is a minimum mandatory

9    ten years on Count 1; Count 2 is up to 20 years

10  without a mandatory minimum.

11          Ms. Coates, do you agree with that

12  analysis of the statutory provisions?

13          MS. COATES:  Yes, Your Honor.

14          THE COURT:  Do you agree, Mr. Bass?

15          MR. BASS:  Yes, Your Honor.

16          THE COURT:  And, Mr. Sorosky?

17          MR. SOROSKY:  Yes.

18          THE COURT:  Under the statute as well as

19  the advisory guidelines, probation is not

20  authorized.  Under the statute as well as the

21  advisory guidelines, supervised release is five

22  years to life.  Restitution under the statute and

23  the guidelines is not applicable.  Under the

24  statute, the fine range is up to $250,000 if Mr. Orr

25  has the ability to pay.  Under the advisory

                                                    13

1  guidelines, the Court has a range of $25,000 to

2  $250,000 if the Defendant has the ability to pay.

3  The statute has a special assessment of $100 per

4  count.  The jury returned two counts, so it's a $200

5  special assessment under the guidelines.  The

6  advisory guidelines follow that as $200.

7          Ms. Coates, has the Court accurately

8  stated the remaining portion of the statutory

9  provisions and advisory guidelines facing Mr. Orr

10  today?

11          MS. COATES:  Yes, Your Honor.

12          THE COURT:  Do you agree, Mr. Bass?

13          MR. BASS:  Yes, Your Honor.

14          THE COURT:  Do you likewise agree,

15 Mr. Sorosky?

16          MR. SOROSKY:  Yes.

17          THE COURT:  The Court has received some

18 correspondence in mitigation and wants to make sure

19 that is noted of the record and we have the most

20 recent just being received this week, Docket 37 from

21 Peter . . . looks like Eschker, E-s-c-h-k-e-r, of

22 Port Huron, Michigan and it's from a next door

23 neighbor at one time.  It's a very eloquent

24 three-page letter.

25          Also filed on May 13th is a letter dated

                                              14

1 May 8th from Ferne Orr, your wife, and I think she's

2 present today, as she was during all of the

3 proceedings; also a letter from your father, William

4 Orr, of Port Huron, Michigan.  Those letters have

5 been received.  Mr. Sorosky, are you -- and are part

6 of the record -- are you aware of any other

7 correspondence that I should have?

8          MR. SOROSKY:  No, Your Honor.

9          THE COURT:  Okay.  That's what's been

10 received as part of the record; it's been reviewed,

11 will be considered in mitigation.

12          Mr. Sorosky has prepared and filed his

13   position paper on sentencing, Docket 35, talking

14   about the advisory guidelines and the Supreme Court

15   decisions in Booker as well as would be Kimbrough,

16   the more recent Supreme Court decisions that have

17   reaffirmed that the guidelines are advisory, not

18   mandatory.  And, of course, well aware of that.

19          The purpose of sentencing today is under

20   18 USC Section 3553(a).  We calculate the guidelines

21   for advice and guidance; but ultimately because they

22   are merely that, advisory, we then turn to the

23   statutory factors to determine a sentence that's

24   sufficient, appropriate and reasonable, not greater

25   than necessary after looking at the character and

                                                    15

1   history of the Defendant and the nature and

2   circumstances of the offense.

3          Mr. Bass, you may be heard.

4          So for Mr. Orr, in addition to your wife,

5   would you indicate who the other lady is.

6          DEFENDANT ORR:  That's my wife's sister,

7   Judy Logan.

8          THE COURT:  Okay, your sister-in-law.

9   Thank you both for being here.  So that the family

10   members and Mr. Orr will know how we proceed, the

11   Court has looked at the evidence in mitigation.

12   Mr. Sorosky, would you be calling in witnesses in

13  mitigation?

14          MR. SOROSKY:  No, Your Honor, no.

15          THE COURT:  Mr. Bass, are you calling any

16  in aggravation?

17          MR. BASS:  One, Your Honor.

18          THE COURT:  Okay.  So we'll be hearing a

19  witness in aggravation.  Then when we're done with

20  that, Mr. Bass will make a recommendation;

21  Mr. Sorosky will make a recommendation and, Mr. Orr,

22  you'll be given a chance to address the Court before

23  I sentence you.  You're not required to.  It would

24  be your choice if you do address the Court.

25          MR. SOROSKY:  Your Honor, if we could

                                                    16

1  correct one thing.

2          THE COURT:  Yes?

3          MR. SOROSKY:  Ms. Orr, the Defendant's

4  wife, may want to say a word or two.

5          THE COURT:  Okay.  Certainly Ferne Orr,

6  the wife, is free to reiterate what she had in her

7  lengthy letter or say anything additionally that she

8  would want, certainly free to do that.  Mitigation

9  will follow Mr. Bass's aggravation.  So, Mr. Bass,

10  you may start first.

11          MR. BASS:  Your Honor, I would call

12  Special Agent Mitchell.

13          (At this point in the proceedings, the

14            Clerk administered the oath.)

15            THE CLERK:  Take the stand, please.

16                      EXAMINATION

17  BY MR. BASS:

18      Q.  Sir, could you state your name, please,

19  and how you're employed.

20      A.  Michael Mitchell; last name is spelled

21  M-i-t-c-h-e-l-l and I'm employed with the Department

22  of Homeland Security, Immigration and Customs

23  Enforcement.

24      Q.  And you were the case agent in this case;

25  is that right?

                                                    17

1      A.  Correct.

2      Q.  Special Agent Mitchell, part of the -- or

3  the investigation of this case related to a search

4  warrant that was executed at the Defendant's

5  residence in Port Huron, Michigan; is that right?

6      A.  That's correct, the search warrant was

7  obtained from an -- by an agent in our office in

8  Detroit.

9      Q.  And that search warrant was executed on

10  September 12th, 2006; is that right?

11      A.  That's correct.

12      Q.  And the time period of the offenses

13  alleged in the indictment were in the weeks prior to

14  that, in late spring into the summer of 2006; is

15    that right?

16         A.    That's correct.

17         Q.    Did you participate in the execution of

18    the search warrant?

19         A.    Yes, I did.

20         Q.    And you're familiar with the evidence that

21    had been accumulated to that point, including chat

22    logs that the undercover agent had generated in

23    her -- his or her conversations with the Defendant?

24         A.    That's correct.

25         Q.    When you -- during the investigation or at

                                                              18

1    the time of the execution of the search warrant, did

2    you observe any photographs of any minor children?

3         A.    I did.  I had -- there was a computer

4    station that the Defendant used and at the top of

5    the station there were several pictures.

6         Q.    And in the pre-sentence report, there is a

7    reference to an interview of a minor child with the

8    initials L.Y.  Are you familiar with that juvenile

9    and the interview that was conducted of her?

10         A.    Yes, she was born in 2001.

11         Q.    Was there a picture of her in that room

12    that you went into in the Defendant's residence --

13         A.    Yes, there was.

14         Q.    -- during the course of the search?

15         A.    Yes, there was.

16      Q.    And can you just tell the Court as a

17  result of the investigation what happened with

18  respect to L.Y. after the search.  Or, first of all,

19  who was --

20      A.    We found out that Mr. Orr's wife had a

21  daughter.  It's his stepdaughter.  Her name was

22  Christine.  The last name is A-k-r-e-d and I'm not

23  sure how to pronounce that.  Akred.  She was a

24  foster parent and there were at least five or six

25  children that visited the Orrs' residence as a

                                                    19

1   result of her being a foster parent.

2       Q.    And was L.Y. one of those --

3       A.    Yes.

4       Q.    -- foster children?

5       A.    Yes.

6       Q.    And following the search warrant in

7   September -- or prior to the search warrant in

8   September of 2006, was L.Y. living in the Port Huron

9   area?

10      A.    Up until I want to say May of 2006.  I

11  think that's when she was placed with a -- some type

12  of relative in Florida.

13      Q.    And following the indictment in this case,

14  did law enforcement officers with the Port Huron

15  Police Department, did they attempt to make contact

16  with L.Y. or her guardian?

17      A.    Actually, the detective in Port Huron

18 interviewed Christine and they attempted to

19 interview the foster children that were there

20 locally and Christine had made a statement that

21 there was a relationship --

22          MR. SOROSKY:  We object to this.  It's

23 hearsay on Christine.

24          THE COURT:  Hearsay is allowed at

25 sentencing, so overruled.


                                                    20


1      A.    -- that Christine had indicated that there

2 was a special relationship between Mr. Orr and Leah

3 and she was identified in Clearwater and a request

4 was made from the Port Huron Police Department to

5 the Clearwater Police Department for her to be

6 interviewed.

7      Q.   And at that time in October of 2006, did

8 representatives from the Clearwater Police

9 Department meet L.Y. in Florida?

10      A.   They did.

11      Q.   And did they have contact and speak with

12 her?

13      A.   They did.  They interviewed the parents

14 and then interviewed the child.

15      Q.   And during that initial interview in

16 October of -- on October 18th, 2006, there was no

17 mention by L.Y. of any sexual abuse at that time,

18  was there?

19      A.    No, there was not.

20      Q.    Then what happened thereafter?

21      A.    Approximately two or three weeks later in

22  November -- the interview happened in October and in

23  November, the foster parent or the adoptive parents

24  in Florida that now had custody of the child said

25  that the child now had -- was having

                                                        21

1  difficulties -- was having --

2            MR. SOROSKY:  Your Honor, we would object

3  to this.  This is in the nature of triple hearsay.

4  This is not in the nature of perhaps --

5            THE COURT:  Well --

6            MR. SOROSKY:  -- stronger hearsay of --

7            THE COURT:  -- I understand.  The Court

8  has -- the higher courts have ruled that hearsay is

9  admissible; then it's up to the Court to determine

10  what weight to give it, whether it's relevant, but

11  the Government is allowed to present hearsay and

12  hearsay on hearsay.  Objection overruled.

13  BY MR. BASS:

14      Q.    So the officers were contacted by the

15  guardians of the juvenile at that time; is that

16  right?

17      A.    Correct, saying that she was now wetting

18  her -- wetting herself and was having some problems.

19     Q.   And was there -- were there reports

20   generated as a result of these contacts?

21     A.   Yeah, by the Clearwater Police Department.

22     Q.   And did they also document their contact

23   with the juvenile's guardians at that time and what

24   they had -- information they had shared with law

25   enforcement?

                                                        22

1     A.   Yes, they did.

2     Q.   And what specifically did the guardians

3   share with law enforcement on April 12th of 2007

4   regarding any disclosures made by L.Y.?

5          MR. SOROSKY:  Your Honor, we would object.

6   We don't even know who the out-of-court declarant is

7   when he says "guardians".

8          MR. BASS:  He's had this report for

9   months, Your Honor.  I gave it to him before trial,

10  so he should know exactly what the information is

11  and where it comes from.

12         THE COURT:  So now it's April 12th of '07

13  that we have an interview with --

14         MR. BASS:  Yes, Your Honor.

15         THE COURT:  -- police and the adoptive

16  parents?

17         MR. BASS:  Yes.  Well, there's going to be

18  an interview of the juvenile on April 12th, 2007.

19         THE COURT:  Were the adoptive parents

20   present?

21          SPECIAL AGENT MITCHELL:   The initial

22   interview, there was --

23          THE COURT:   The objection is overruled.

24          SPECIAL AGENT MITCHELL:   -- they were and

25   then there was an interview conducted by I think

                                                    23

1   it's called Help a Child.   It's similar to our child

2   advocacy centers.

3   BY MR. BASS:

4          Q.   So was -- there was contact by the --

5          A.   The guardian had contacted the detectives

6   in the case and had indicated that she was in the

7   process of potty training one of her other children,

8   which was a boy, and the young girl had seen the boy

9   going to the bathroom and pulling on his penis and

10   had indicated that, you know, he was going to hurt

11   himself.

12          The guardian asked if that's the first

13   time she had ever seen a penis and she had indicated

14   that no, she had actually seen grandpa's, indicating

15   Mr. Orr's.

16          Q.   And did she identify grandpa as the

17   Defendant?

18          A.   Yes.

19          Q.   As a result of that information, was the

20   child advocacy center contacted, the Help a Child,

21  Incorporated Child Protection Team Program in

22  Pinellas Park, Florida?

23      A.   Yes.

24      Q.   And as a result of that contact, what

25  happened?

                                                    24

1       A.   She was interviewed.

2       Q.   By whom?

3       A.   By a juvenile interviewer, an individual

4   that's trained to interview children.

5            MR. BASS:  May I approach the witness,

6   Your Honor?

7            THE COURT:  You may.

8            MR. SOROSKY:  We have no objection to

9   the -- we object to the hearsay, but we have no

10  objection to the procedure of the U.S. Attorney

11  approaching the witness and having the witness

12  identify the documents and so forth.

13           THE COURT:  Okay.  Well, the objection to

14  hearsay is a standing objection and the Court has

15  already ruled on that.

16  BY MR. BASS:

17      Q.   For the record, Agent Mitchell, what I

18  handed you was a report from the Help a Child, Inc.

19  Child Protection Team Program; is that right?

20      A.   That's correct.  And this was provided to

21  me via fax from the Port Huron Police Department.

22     Q.    And the date of that report is what?

23     A.    The date of this report is April 17th of

24  2007.

25     Q.    And that is a report of a Susan or

                                                      25

1  Susanne --

2      A.    McAree, M-c-A-r-e-e.

3      Q.    Susan McAree with the title M.S.; is that

4  right?

5      A.    Correct.

6      Q.    And was she the forensic interviewer who

7  conducted the interview of L.Y. on that date?

8      A.    That's correct.

9          MR. BASS:  Could you turn to -- Your

10  Honor, I'm not going to ask to admit this because it

11  has the child's name in it, so I'm just going to ask

12  Special Agent Mitchell to summarize and then read

13  into the record the findings of the interviewer.

14          THE COURT:  You may.  I was hoping we

15  wouldn't have a trial within a trial, but now we've

16  started.

17  BY MR. BASS:

18     Q.    Could you just describe in summary what

19  L.Y. related to the forensic interviewer about the

20  Defendant.

21     A.    That he had shown his penis to her and had

22  had her touch and hold it while at her -- at the

23    Defendant's residence.  She had indicated that two

24    of the other foster children were at the residence

25    doing crafts with Ms. Orr at the time.

26

1         Q.   Did she relate the location of where this

2    incident --

3         A.   By his computer.

4         Q.   Is that consistent with what the parents

5    had told law enforcement officers earlier?

6         A.   Yes.

7         Q.   And is there a conclusion paragraph at the

8    end of the report of the interviewer about any

9    findings?

10         A.   Yes.

11         Q.   Could you just read that report or that

12    paragraph.

13         A.   I'm going to drop out her name and just

14    use "L".  L came into the interview and readily made

15    disclosures about holding her grandfather's penis,

16    pee pee in parentheses.  She was consistent through

17    the interview about this event.  She had become

18    comfortable with particular aspects of her abuse and

19    telling someone about it.

20              She had originally disclosed oral sex to

21    her aunt and her penetrator had indicated that he

22    had a victim who was performing oral sex on him, but

23    L was not able to discuss this on this date.

24          Disclosing sexual abuse is often a process

25  for children and often the details of abuse are


27

1  provided bit by bit.  At time -- as time goes by and

2  she is in therapy and feels safer, she will likely

3  provide more details of her victimization.  Based on

4  what she did disclose, sexual abuse is verified.

5          MR. BASS:  That's all I have, Your Honor.

6          THE COURT:  Mr. Sorosky, you may examine

7  if you wish.

8          MR. SOROSKY:  No questions.

9          THE COURT:  You may step down,

10  Mr. Mitchell.

11          SPECIAL AGENT MITCHELL:  Thank you, Your

12  Honor.

13          THE COURT:  Anything further in

14  aggravation, Mr. Bass?

15          MR. BASS:  No, Your Honor.

16          THE COURT:  Anything further in

17  mitigation, Mr. Sorosky?

18          MR. SOROSKY:  Yes, we're going to present

19  mitigation.

20          (At this point in the proceedings, the

21           Clerk administered the oath.)

22          THE CLERK:  Take the stand, please.

23                      EXAMINATION

24  BY MR. SOROSKY:

25        Q.    Would you please state your name.

28

1        A.    Ferne Mae Orr.

2        Q.    And what relation are you to the

3   Defendant?

4        A.    I am his wife.

5        Q.    And approximately how long have you and

6   Mr. Orr been married, approximately?

7        A.    We were married for seven years.

8        Q.    And where do you live?

9        A.    I'm at -- I want to go back and say I

10   consider myself married to Dan.  Legally we are

11   divorced.

12        Q.    I understand.

13        A.    But I just want to make that statement

14   because it's the truth.  In my heart, no, it's not

15   true.  We live --

16        Q.    And that divorce occurred after this

17   indictment?

18        A.    Oh, absolutely.

19        Q.    And for how long have you and he

20   been -- how long were you two married prior to the

21   legal divorce?

22        A.    Seven years.

23        Q.    Where do you live?  What town do you live

24   in?

25        A.    I live in Port Huron, 2437 19th Avenue.

29

1      Q.    That's in the state of Michigan?

2      A.    Yes.

3      Q.    And you and Danny lived there during the

4   course of your marriage?

5      A.    Yes.

6      Q.    Now, you were in the courtroom earlier

7   when Judge McCuskey related to the letter that you

8   wrote to him.

9      A.    Yes.

10      Q.    And as Judge McCuskey has stated, he has

11   read that letter and --

12      A.    Uh-huh.

13      Q.    -- that the letter is a part of the

14   record.  So, recognizing that, is there anything you

15   would like to say to the Judge in addition to or in

16   accord with the letter, recognizing it's not

17   necessary that you repeat everything in the letter

18   because the Judge has said he has read that, studied

19   it and it is a part of the record as if you said it

20   right here.

21          So is there anything else you would like

22   to tell Judge McCuskey concerning this sentencing

23   hearing where shortly from now he is going to impose

24   sentence on Danny?

25      A.    Yes.  I want to say, first of all, that my

30

1    daughter has had over 50 -- I think now 55 children

2    in her home in the last eight years.  The children

3    she was -- L was with -- was my grandchildren, my

4    birthright grandchildren.

5            She had two sons, had difficult

6    pregnancies and my daughter did not have a father,

7    being raised by myself and a stepfather that I was

8    married to for 18 years.  She wanted to take care of

9    children and all of these children she has gotten

10   are from drug homes.  Leah came -- I'm sorry, I said

11   her name -- but she came to my daughter with a

12   broken arm.

13           She always has two, three, usually four

14   foster children because you could have up to six.

15   She's adopted two of those children.  Every foster

16   child my daughter has had in her home, there are

17   pictures.  And if she has them over a couple months,

18   they are included in family pictures.  Every child

19   when she leaves the home or he leaves the home has

20   pictures so they have that when they grow up.  With

21   her own money she does that.

22           THE COURT:  How long has she had foster

23   children?

24           MRS. ORR:  It would be -- my grandson is

25   ten so it would be eight years she's had these

31

1  children in and out.

2          THE COURT:  She still has foster children

3  today?

4          MRS. ORR:  Yes, yes.  She has two adopted

5  children, two of her own and two that are foster

6  children at this moment.

7          THE COURT:  Now, she did that in

8  Port Huron, Michigan?

9          MRS. ORR:  Yes.

10          THE COURT:  Is that where she's always had

11  foster children?

12          MRS. ORR:  Yes, and she lives one block

13  from me.  The only children that were allowed to

14  come -- because they're too small -- was my two

15  grandchildren, who were ten and eight at the time.

16  We can see the houses.  To keep them safe.

17          THE COURT:  Do you know if any of the

18  authorities in Florida have ever made any complaints

19  to children and family authorities in Michigan to

20  investigate the claims of L.Y. and to take any

21  action against your daughter as a foster parent?

22          MRS. ORR:  None whatsoever.

23          THE COURT:  You may continue, Mr. Sorosky.

24          MRS. ORR:  And my grandchildren were also

25  questioned if there was any misconduct.  When I was

1  being questioned --

2          THE COURT:  So you were aware of this

3  investigation?

4          MRS. ORR:  I was not aware until earlier,

5  but I thought, there's no way that this happened,

6  first of all, because I was always there if she was

7  in my home, which was not very often because of the

8  hours I work, because of the surgeries he went

9  through --

10          THE COURT:  Were there any periods of

11  time, though, that Danny could have been with L.Y.

12  and you or your daughter were not present?

13          MRS. ORR:  No.  My grandsons, too.  This

14  little girl would not move unless you said, "Honey,

15  come over here."  She was hurt.  When we got her, we

16  did everything we could to keep her from going back

17  to the mother, who was a drug addict.

18          THE COURT:  So you've assisted your

19  daughter in the foster care by having them in your

20  home from time to time?

21          MRS. ORR:  I would say yes, a few times.

22  But I'm always "Grandma".  When Christmas comes,

23  they don't give them enough.

24          THE COURT:  Now, do they refer to Danny as

25  "Grandpa"?

                                                    33


1          MRS. ORR:  Yes, and my mother is "G-G".

2  You try to make it -- and my daughter is always

3  "Mama".  It's amazing, within a half an hour, a

4  foster child will start calling his foster mother

5  "Mama".

6          THE COURT:  Do you know how long L.Y. was

7  in your daughter's care?

8          MRS. ORR:  Yes, for over two years.  And

9  she could not get her to go to the bathroom.  She

10  was in counseling.  My daughter drove her for a half

11  an hour to St. Clair where they had special

12  counseling for this child because she -- I mean,

13  it's not normal for a child --

14          THE COURT:  How was she adopted to Florida

15  if your daughter has always been in Port Huron,

16  Michigan?

17          MRS. ORR:  Because my daughter cares about

18  these children so much and found out that she had an

19  Aunt Phyllis that would take her and we want them to

20  be with family and they got to know each other --

21  BY MR. SOROSKY:

22      Q.  By "they," you mean -- who do you mean?

23      A.  My daughter Christine and the aunt.  When

24  the aunt showed --

25          THE COURT:  It's not a relative of yours?

34

1          MRS. ORR:  No, no, it's an aunt of the

2  little girl.

3            THE COURT:  Okay.  Her biological aunt?

4            MRS. ORR:  Yeah.  And that is again a half

5    sister.

6            THE COURT:  Who lives in Florida?

7            MRS. ORR:  That, yes, lives in Florida and

8    was aware that her sister --

9            THE COURT:  So then she came to Michigan

10   and was able through the Michigan authorities to get

11   guardianship to take her to Florida?

12           MRS. ORR:  Right.  And she's also a foster

13   mother so the proceedings happened quicker.  It's a

14   long process, very long, and I cannot tell you the

15   heart-wrenching stories I have heard and learned

16   about.

17           But to be put in this position and being

18   accused of this, Your Honor, if God should strike me

19   dead, it couldn't have happened because it

20   just -- that house is so small and I'm always right

21   there and that little girl -- you had to say, "Do

22   this, do this."  They couldn't --

23           THE COURT:  Was there a picture on Danny's

24   computer?

25           MRS. ORR:  No, no, on top of our computer

                                                        35

1    desk along with all the other grandkids.

2            THE COURT:  So --

3            MRS. ORR:  Because she had just left and

4   when she walked in our house, we have 8-by-10

5   pictures all over of all the grandkids and I've got

6   pictures of many of the foster children.

7           THE COURT:  So L.Y. was not singled out?

8   Other children were there also in the pictures?

9           MRS. ORR:  Oh, yes.  And I have many

10  pictures that my daughter actually goes and gets --

11  now, Olan Mills actually have given her pictures of

12  foster children because she knows that she pays for

13  these.  She pays for them.

14          It's more -- they're trying to work foster

15  parenting into helping place these children where

16  they belong.  I wish I had time to tell you about a

17  story about a child she was going to adopt from a

18  man who adopted a foster child and had six children

19  with her, six.

20  BY MR. SOROSKY:

21      Q.   You used the term "Olan Mills".  Who

22  is --

23      A.   Olan Mills is a photograph or a

24  photography --

25          THE COURT:  We have them around here, too.


                                                        36


1           MRS. ORR:  Yeah, but we always accepted

2   these children with great love and care, taking them

3   to doctor visits.  We even drove this little girl

4   down with my daughter to a special doctor to see

5   mentally what they could do for her.

6   BY MR. SOROSKY:

7       Q.   Ms. Orr, if I could ask you a question,

8   what is your daughter's name?

9       A.   Christine Akred.

10      Q.   How do you spell that?

11      A.   A-k-r-e-d.

12      Q.   And how old is your daughter,

13  approximately?

14      A.   58.  She'll be 58.

15           DEFENDANT ORR:  38.

16  BY MR. SOROSKY:

17      Q.   And is she present --

18      A.   Oh, I'm so sorry.  She's 38.  I'm not even

19  58 yet.  How could she be -- I'm sorry.

20      Q.   And does your daughter live in Port Huron,

21  Michigan?

22      A.   Yes, she does.

23      Q.   And where does this daughter live in

24  relation to you?  I mean, next door?  A block away?

25      A.   One block.

                                                    37

1       Q.   And does your daughter live with any other

2   adults?  I mean, is she like a single mom?  Is she

3   married?  Divorced?  What's her living situation?

4       A.   She's married, separated right now.

5       Q.   She's separated from her husband?

6    A.    There is a lot of stress when you have six

7  children in the house.

8    Q.    And how long was she married,

9  approximately?

10    A.    15 years, I think.

11    Q.    And when -- approximately when did your

12  daughter first become a foster parent?

13  Approximately when.

14    A.    Eight years ago.

15    Q.    And at the time she began this, she was

16  married?

17    A.    Yes.

18    Q.    Living with her husband?

19    A.    Yes.

20    Q.    Now, did your daughter and her husband,

21  did they have any natural children of their own?

22    A.    Yes.

23    Q.    How many children did they have?

24    A.    Two.

25    Q.    And what were the ages of the foster

38

1  children in relation to her natural children?  Were

2  they all around the same age or different ages or

3  can you explain that?  Approximately.

4    A.    No, my daughter never took children over

5  the age of five.

6    Q.    So all of the children she took were under

7   the age of five and as her natural children got

8   older and older, the natural children were always

9   older than the foster children?

10     A.   Right.  Well, in the beginning, yes, they

11  were the same age because Kyle was two and their

12  first little guy was two.

13     Q.   And just to explain everything to Judge

14  McCuskey, what would happen when a foster child

15  reached the age of five or six or your daughter felt

16  they were too old?  What would happen?

17     A.   Well, she never had them that long.  The

18  reason -- do you want to know why the reason she

19  wouldn't take them over the age of five or six?

20     Q.   Right, what would happen?  Did the system

21  take them?  Did she feel she couldn't handle them

22  that old?  Explain that to the Judge.

23     A.   Was the question why she didn't take older

24  children than --

25     Q.   No, not so much why she didn't take older

39

1   children.  We understood she took younger children,

2   but why didn't they stay beyond the age of five?

3      A.   Oh, because they were usually placed by

4   this time either back with the mother or --

5      Q.   Adopted?

6      A.   -- adopted with a -- placed with a family

7   member of the child, of the relatives.

8    Q.    So would it be accurate to say that every

9  child that your daughter had in foster care, by the

10  time they reached the age of approximately five, to

11  use your term, was placed somewhere?

12    A.    Yes.

13    Q.    And that would be either with the original

14  natural parent or some type of adoption?

15    A.    Yes.

16    Q.    So -- and how many foster children were

17  usually in the house at the same time?

18    A.    In my daughter's house?

19    Q.    Yes.

20    A.    Usually --

21    Q.    Approximately.

22    A.    -- two to four.  Two to four, yeah,

23  besides her own two children.

24    Q.    And were there an equal number of boys and

25  girls or --


                                                    40


1    A.    Oh, it always changed.  I mean, it could

2  be that she had all boys and one girl, you know.  I

3  mean, she didn't ever turn them away because they

4  were a boy or they were a girl.

5    Q.    So generally, though, it was about 50/50

6  between boys and girls?

7    A.    Yeah, whatever came in that house for that

8  day -- there might be a drug raid and they would

9   call her in the middle of the night and she would

10  actually get okay to keep them for a few days until

11  they could place them with someone else.

12      Q.   So there was some kids who would just stay

13  for a relatively short time?

14      A.   Oh, a very short time sometimes.

15      Q.   And then there were others who would be

16  present for a long stay?

17      A.   Usually -- I would say the majority of the

18  time, it's six months.  Because it takes that long

19  for the courts to decide.

20      Q.   Now, did your daughter -- I'm just

21  asking -- did your daughter ever personally adopt

22  any of the foster children?

23      A.   Yes.

24      Q.   How many did she adopt?

25      A.   Two.

                                                    41

1       Q.   And what are their ages today?

2       A.   Three and a half and two and a half.

3       Q.   Now --

4       A.   And the reason she got into foster caring

5   was she wanted a baby girl and she couldn't have

6   anymore children.  Loved them, loved these children.

7       Q.   Now, turning our attention now to another

8   topic, you recognize in a relatively short period of

9   time, Judge McCuskey is going to sentence your

10   husband?

11         A.    Yes.

12         Q.    And you recognize, as you've heard in

13   court, the minimum sentence the Judge can impose is

14   ten years?

15         A.    Yes.

16         Q.    So even if your husband should be

17   fortunate enough to get the minimum sentence, you

18   certainly recognize that that in and of itself is a

19   very, very harsh sentence?

20         A.    Yes.

21         Q.    You would agree with that, wouldn't you?

22         A.    Yes.

23         Q.    Is there anything you would like to state

24   to Judge McCuskey now as to why he should at least

25   impose the minimum sentence as opposed to a more

                                                            42

1   harsh sentence?

2         A.    Well, what I can say is that my husband

3   has been a changed man because he could no longer go

4   to drugs to take care of his pain.  We have prayed

5   and he has given himself to the Lord and there is no

6   greater medicine than that.

7               And I know he did wrong in talking to

8   someone.  I myself should never speak to him again,

9   but the Lord spoke to me and I must forgive and I

10   do.  And I love my husband and I will do all that I

11  can to spread the good word that there is hope.

12          And there's danger on the internet and

13  people don't understand.  I clicked the wrong thing

14  the other day and had to call and have something

15  taken off a bill I didn't even know and they said,

16  "It happens all the time, don't worry."  There's

17  danger.  He could only talk about it.  We couldn't

18  perform sex together.

19          It's a terrible thing, but it takes

20  sometimes this to change your whole life.  My life

21  has been changed, but for the better because I truly

22  know how to love and how to forgive and we need to

23  help people.

24          This came out of pain.  It did not come

25  out of a man who wanted to harm somebody.  And I

                                                    43

1  promise you, that is not -- the picture is not the

2  truth.

3          This world, we believe -- when anyone

4  would say such a thing, we automatically believe the

5  story is true because we're all hurting; we've all

6  been hurt somewhere and I can understand how easily

7  it would be to get them to get a child to say what

8  she did.

9          And has she ever seen a penis before?

10  With a lot of diapers being changed, yes, sir, she

11  had.  We just never made a big deal about it.  And

12   if that's wrong, then they need to tell my daughter,

13   "You can't change a baby boy in front of a little

14   girl."

15           I just beg for mercy for my husband and I

16   thank you for taking the time to listen to me.  We

17   all need to help one another.

18           THE COURT:  Anything further, Mr. Sorosky?

19           MR. SOROSKY:  No further questions.

20           THE COURT:  Mr. Bass, any questions?

21                    EXAMINATION

22   BY MR. BASS:

23       Q.  Ma'am, were you aware of the full scope of

24   your husband's conduct in your home when the two of

25   you were married?

                                                    44

1        A.  I don't know what you're referring to.

2        Q.  With respect to -- let me be more

3   specific.  Were you aware at all of his conduct with

4   respect to possessing child pornography, for

5   example?

6        A.  No.

7        Q.  You worked full-time during the day,

8   right?  He didn't?

9        A.  Yes.

10       Q.  So --

11       A.  He's disabled.

12       Q.  So, on a regular basis, he would be at

13    home and out of your sight while you were at work,

14    correct?

15         A.   Correct.

16         Q.   And it would be safe to say you would not

17    be aware of what he was doing on a daily basis

18    inside your home when you were not there --

19         A.   Correct.

20         Q.   -- right?  And I'm assuming that you had

21    no knowledge that he was at your home on the

22    computer possessing and distributing -- not only

23    possessing child pornography, but distributing it to

24    other people, in other words, sending child

25    pornography to other people on the internet.  You

                                                        45

1    were not aware of that, were you?

2              MR. SOROSKY:  Your Honor, we object to

3    this.  It's outside the scope of the direct

4    examination.

5              THE COURT:  No, we just got into the

6    situation; the door got opened about what abilities

7    he would have had to do anything improper so the

8    objection is overruled.

9              MRS. ORR:  No, I wasn't, no.

10    BY MR. BASS:

11         Q.   In fact, he took steps to conceal from you

12    what he was doing, didn't he?

13              MR. SOROSKY:  Your Honor --

14          MRS. ORR:  How would that be?

15          MR. SOROSKY:  Your Honor, if I could

16 object, this witness has said she was not aware of

17 the Defendant's activities so, therefore, I don't

18 think it's fair now for the U.S. Attorney to allege

19 everything the Defendant he believes did wrong, to

20 have her say, "I wasn't aware of this, I wasn't

21 aware of this, I wasn't aware of this."  She has

22 said she was not aware of these activities.

23          THE COURT:  Well --

24          MR. BASS:  I just have a few --

25          THE COURT:  If it's asked and answered, I


                                                    46

1 agree with you.  So you may go on, Mr. Bass, but try

2 not to repeat the same areas.

3 BY MR. BASS:

4       Q.   Do you have a relative by the name of

5 Paula Dudgeon?

6       A.   I don't.

7       Q.   Does --

8       A.   Yes.

9       Q.   -- your husband have a relative?

10      A.   Right.

11      Q.   And she lives in Ohio, right?

12      A.   Uh-huh.

13      Q.   And are you aware that he took steps to

14 contact her to ask her to provide a false story to

15  you as to him traveling to Ohio when, in fact, he

16  was going to Decatur?  Were you aware of that?

17          MR. SOROSKY:  Once again, we would object

18  to that.

19          THE COURT:  Overruled.  That's proper, the

20  inquiry as to whether he would be able to create a

21  lie to make her think one thing was happening when

22  it wasn't, so the objection is overruled.

23  BY MR. BASS:

24      Q.   Did that happen?

25      A.   Can I ask you again to tell me -- say it

47

1  again.

2      Q.   Are you aware of an incident where your

3  husband contacted Ms. Dudgeon to ask her to give you

4  a false story about him coming to Ohio when, in

5  fact, he was going to travel to Decatur?

6      A.   No, I did not know that.  When do you want

7  me to say I knew that?

8      Q.   I'm just asking if you were aware of it.

9      A.   No, I was not aware of it.  Before my

10  husband was --

11      Q.   That's all right.  That's all that I asked

12  you.

13          THE COURT:  I'll let her finish.

14          MRS. ORR:  I don't know.  I mean --

15  BY MR. BASS:

16     Q.   Before your husband was arrested, were you

17 aware of any --

18     A.   Oh, no.

19     Q.   -- time where he contacted Ms. Dudgeon to

20 attempt to provide a false alibi as to his travels?

21     A.   No.

22     Q.   And have you seen any of the transcripts

23 of his conversations with people on the internet as

24 to what he wanted to do with young children as young

25 as five and three?

                                                    48

1     A.   No, but --

2     Q.   So you weren't aware of him engaging in

3 that activity either, right?

4     A.   Can I ask you something?

5     Q.   No, I'm asking you a question.

6     A.   Okay.

7     Q.   I just --

8          THE COURT:  Let me just cut to the chase.

9 I know that you were here at various times during

10 the jury trial, but I can't remember whether you

11 were in court when the transcripts were being put up

12 for the jury and read.

13          MRS. ORR:  No.

14          THE COURT:  Okay.  I didn't think you were

15 here for all of the trial.

16          MRS. ORR:  But it takes two to talk and

17   people say things like they don't know -- I mean,

18   they don't -- they say things that they wouldn't

19   even speak on the internet.  I've been told that by

20   people.  I never had time to be on the internet

21   because I worked so much, but --

22   BY MR. BASS:

23        Q.   That was my question.

24        A.   It takes two people to talk.

25        Q.   There were -- this activity that was going

49

1    on would be an example of him engaging in activity

2    of which you were totally unaware, right?

3         A.   Of speaking to someone on the internet,

4    correct, I was not aware of that.

5              MR. BASS:  That's all I have, Your Honor.

6              THE COURT:  Mr. Sorosky?

7              MR. SOROSKY:  Your Honor, we would move

8    that the content of Mr. Bass's questions be struck

9    from the record or at least not considered by

10   Your Honor because Mr. Bass made a lot of

11   allegations and this witness kept saying, "I'm not

12   aware of it, I'm not aware of it, I'm not aware of

13   it."

14             THE COURT:  Well, if he said, "Did you

15   know whether your husband wanted to kill the

16   President of the United States," and her answer is,

17   "No," the fact that he made the statement, we know

18   the statements are not evidence and we even tell the

19   jury that and I know that, so his statement is not

20   evidence; her answer is the evidence.

21         So I'm only considering her answers where

22   she has made statements that -- of what she knows.

23   I know most of what she's said.  It's quite clear.

24   It's in her letter also as to what she didn't know.

25   But obviously everybody has a right to take all of

50

1    the Court's time, as much as possible, and that's

2    what we're doing today.

3         MR. SOROSKY:  Well --

4         THE COURT:  You may go on, too.

5         MR. SOROSKY:  No, I don't care to go on,

6    but just to follow up on your example, when you

7    said --

8         THE COURT:  I wish I hadn't made it.  I

9    take it back.  I strike it from the record.  It

10   isn't in the record.

11        MR. SOROSKY:  No, it's a good example.

12        THE COURT:  No, it isn't.  I mean, we're

13   just killing a dead horse here.  I mean --

14        MR. SOROSKY:  Okay, very good.  Nothing

15   further.  Nothing further for Ms. Orr.

16        THE COURT:  I'm not cutting you off --

17        MR. SOROSKY:  No, no, no.

18        THE COURT:  -- because I've had people go

19    in allocution for two hours when we only set it for

20    20 minutes --

21          MR. SOROSKY:  No, no, nothing further for

22    Ms. Orr.

23          THE COURT:  -- so I do not want the

24    Seventh Circuit Court of Appeals when they read this

25    transcript to in any way think I am trying to shut

                                                        51

1    you or Ms. Orr off.

2          MR. SOROSKY:  No, we had no more questions

3    of Ms. Orr.  I was just going to engage in colloquy

4    about your example, but that's not necessary.

5    That's just lawyer talk.

6          THE COURT:  Well, and I wish I hadn't

7    opened the door.

8          MR. SOROSKY:  We have no further questions

9    of Ms. Orr.

10          THE COURT:  Ms. Orr, is there anything

11    further you would like to say?

12          MRS. ORR:  Can I ask a question about the

13    charges?

14          THE COURT:  Well, I think you were here

15    during the trial and remember, I read them?

16          MRS. ORR:  Yes.

17          THE COURT:  I read them this morning.

18    That's what was before the jury.  That's what the

19    jury found Danny guilty of beyond a reasonable

20  doubt.

21          MRS. ORR:  Okay.

22          THE COURT:  And then I affirmed the jury's

23  finding and found that there was overwhelming

24  evidence of his guilt to support their verdict and I

25  denied the motion for a new trial.  So the next

                                                    52

1  avenue will be when we conclude today to be an

2  appeal of the jury trial, the process and the

3  sentence today.

4          MRS. ORR:  Okay, so there's nothing more.

5          THE COURT:  So does that explain to you

6  where we're at?

7          MRS. ORR:  Yes.  Thank you.

8          THE COURT:  Anything more you wish to say?

9          MRS. ORR:  Thank you.

10          THE COURT:  Thank you.  You may step down.

11  Anything further, Mr. Sorosky, in mitigation?

12          MR. SOROSKY:  Ms. Logan.

13          (At this point in the proceedings, the

14           Clerk administered the oath.)

15          THE CLERK:  Take the stand.

16                          EXAMINATION

17  BY MR. SOROSKY:

18          Q.  Can you state your name.

19          A.  Judy Logan.

20          Q.  And you are the wife of the witness who

21    just testified -- excuse me.  You are the sister of

22    Ferne Orr; is that correct?

23        A.    Correct.  Dan is my brother-in-law.

24        Q.    And for how long have you known Dan,

25    approximately?  Approximately.

                                                          53

1        A.    I've known Dan for 35 years.

2        Q.    So let me begin by saying -- asking you

3    this question.  You don't know anything about the

4    facts of this case firsthand or anything of that

5    nature; is that correct?

6        A.    I know all hearsay.

7        Q.    Right.  You just know what people have

8    told you?

9        A.    Correct.

10       Q.    Whoever the people are?

11       A.    Correct.

12            THE COURT:  You weren't present during the

13    trial?

14            MS. LOGAN:  No, sir.

15    BY MR. SOROSKY:

16       Q.    Now, I would ask you the same question I

17    asked your sister.  You recognize in a relatively

18    short period of time Judge McCuskey is going to

19    sentence Danny Orr?

20       A.    Correct.

21       Q.    And you recognize that even if

22    Judge McCuskey were to be gracious enough to

23    sentence Danny to the minimum sentence of ten years,

24    that is certainly a very harsh sentence?

25        A.    Yes.


                                                          54


 1        Q.    Now, is there anything you would like to

 2    tell Judge McCuskey about what you know about Dan as

 3    to why the Judge should be as lenient as he feels

 4    reasonable?

 5        A.    Well, I have my letter with me.

 6            THE COURT:  Go right ahead and read it.

 7    BY MR. SOROSKY:

 8        Q.    Do you want to read it or do you want to

 9    summarize it?

10        A.    No, I would like to read it, please.

11    Honorable Judge McCuskey, I'm Judy Logan,

12    sister-in-law of the Defendant.  I have known Dan

13    for as far back as when we were just kids attending

14    the Free Methodist Church.  Dan was always a polite,

15    good-looking and likable guy and my sister fell in

16    love with him way back then and she finally married

17    him 34 years later.

18            Dan was living in Oregon and he came back

19    to Michigan; in settling here, brought a multitude

20    of happiness not only to my sister but his father

21    and mother.  He was willing to help out with

22    anything anytime we asked Dan.

23          He suffers with rheumatoid arthritis and I

24   suffer as well with osteoarthritis and I'm no

25   stranger to pain related with the disease.  Dan, on

                                                  55

1   more than one occasion, taxied me to out-of-town

2   doctors' appointments when asked and I feel a great

3   deal of compassion for this man knowing him because

4   of the love and respect always shown to me.

5          I understand the Court's confusion about

6   Dan's intent.  Dan thought he was involved in a

7   fantasy chatroom with a woman 35 years old.  The

8   internet is full of filth, sites that have no

9   business being there, but they are.

10          No doubt, bad choices were made by a man

11   under the influence of strong prescription drugs,

12   depressed, looking to something that does not

13   parallel with his true nature.

14          This man took 53 days to capture a man

15   that is not a predator, but was a man who was sucked

16   in by persuasion from the agent involved.  He was

17   goaded into purchasing tickets with the intent to

18   help this mother out and now is being prosecuted as

19   trying to lure children out of state for the purpose

20   of sex.  Dan is not that man.  He is a generous,

21   kind, loving and always respectful.

22          Locking a man in prison for some things

23   that were said but never done is bringing severe

24    judgment by the opinion of men.  Only God knows

25    Dan's intent.  He does not deny his involvement in


                                                            56


1    the conversation.  That makes him an honest man who

2    went where he shouldn't have.  Dan never intended to

3    hurt anyone.  He has given his life and destiny to

4    God.

5            I only ask that you look beyond what the

6    world offered Dan, the filthy internet, his own

7    flesh and the depths that our souls can be immersed

8    when Satan has a hand in it, and see Dan.  He is a

9    law-abiding man who never intended to do any heinous

10    crime.

11            I plead with you to trust your heart and

12    your mind and give Dan the opportunity to show you

13    his true nature.  He is no threat to society.

14            I am confident that you are a kind, fair

15    and compassionate judge who will decipher and

16    deliver a decision based on all the facts.

17            And above my letter, I would also like to

18    comment on L.  When L came to Christine, she not

19    only had a broken arm, she was broken inside.  This

20    little girl has been through a lot.  She's been

21    through abuse from her own parents.

22            Christine would take her to a visit with

23    her mother and she would come home and the same

24    thing would happen to that little girl; she would

25    wet.  She would go backwards.  She would take 50

57

1    steps backwards every time she went near her mother.

2    She's a broken little girl.

3            As far as my great nephews and my sister's

4    home, my sister doesn't do crafts in a bedroom.

5    Ever.  There is the kitchen table.  That's where we

6    always do everything.  There are no crafts going on

7    in a bedroom.  That is not the truth.  That is not

8    the truth.

9            The truth is Dan went where he shouldn't

10   have gone on the internet.  He got sucked in by the

11   person on the other end of the line who participated

12   and ultimately didn't wait, didn't wait for him to

13   come here.  They came to get him to make him look

14   guilty.  That's not that man that's sitting right

15   there.  That's not that man.  So if you think you

16   have a predator, you don't.  People murder and get

17   less time than this.

18            THE COURT:  Not in my court.

19            MS. LOGAN:  Drug dealers -- well, thank

20   you, sir.  Thank you.  I appreciate that.

21            THE COURT:  And I sent a drug dealer to

22   prison for life yesterday.

23            MS. LOGAN:  God bless you.  God bless you.

24   I am glad to hear that .  I am glad to hear that.

25            THE COURT:  So if you sat here day after

58

1  day, you would know that the average sentence in

2  this court, the minimum is ten, the average is about

3  20 and a lot of people get 30 to life.

4            MS. LOGAN:  But, sir --

5            THE COURT:  And I don't bring the cases

6  here.

7            MS. LOGAN:  I'm not telling you --

8            THE COURT:  I don't choose the Defendants.

9            MS. LOGAN:  I'm not telling you -- I won't

10  tell you how to run your courtroom.

11            THE COURT:  Well, go right ahead and tell

12  me.

13            MS. LOGAN:  I can't.  I don't know how.  I

14  don't know how.  I only know what's in my heart and

15  in my mind.

16            THE COURT:  You weren't here during the

17  trial, were you?

18            MS. LOGAN:  No, I wasn't, sir.

19            THE COURT:  I was.

20  BY MR. SOROSKY:

21       Q.   Now, if I could ask you --

22       A.   Okay.

23       Q.   -- just one last -- I think everyone

24  understood your letter and it was very clear.  There

25  was only one passage that was a little uncertain or

59

1   unclear.  You said something in your letter, you

2   alluded to the Judge's confusion.  What did you mean

3   by that or --

4        A.   I said I can understand the confusion of

5   what was said, but fantasy is one thing, reality is

6   another.

7        Q.   So you mean there was confusion during the

8   trial as to what was said in relation to what the

9   prosecution asserted and --

10       A.   That is what I believe.

11       Q.   -- and what the defense was asserting as

12  opposed to Judge McCuskey's confusion?

13       A.   What I believe is that when you go to the

14  internet and you go to these filthy sites and it

15  says "fantasy," fantasy and reality are two

16  different things.

17       Q.   So would it be correct in saying what you

18  meant by the Judge's confusion was the different

19  interpretation of the facts between the prosecution

20  and the defense and the dispute that occurred during

21  the trial?

22       A.   Yeah, it's just my own feeling.  It's --

23  I'm saying I understand the confusion between what

24  men think and what actually, actually was the intent

25  of the man.

1          MR. SOROSKY:  Okay.  Nothing further from

2  this witness.  I just wanted to clear that one point

3  up.

4          MR. BASS:  No questions, Your Honor.

5          THE COURT:  You may step down.

6          MS. LOGAN:  Thank you, sir.

7          THE COURT:  Additional evidence in

8  mitigation or in response to Mr. Mitchell?

9          MR. SOROSKY:  Just Mr. Orr.

10          THE COURT:  Okay.  Did you want him to do

11  it in allocution?

12          MR. SOROSKY:  Sure.

13          THE COURT:  Okay.  Let's wait, though,

14  until we have the recommendations and then he can

15  speak in allocation.

16          Mr. Bass, you may be heard as far as the

17  Government's recommendation.  We've completed

18  aggravation; we've completed mitigation.  We'll now

19  hear the Government's recommendations and then we'll

20  hear from Mr. Sorosky as to his recommendation and

21  then, Mr. Orr, you may address the Court if you

22  wish.  You're not required to before the Court

23  imposes sentence.  Mr. Bass.

24          MR. BASS:  Your Honor, after listening to

25  the testimony of the last two witnesses, I don't

                                                    61

1  think anyone could quarrel with the

2  understandability of what we heard.

3            THE COURT:  Well, they weren't present for

4  the trial.

5            MR. BASS:  But my point -- that's my point

6  exactly.  While there may be a difference between

7  fantasy and reality, there's also a difference

8  between one's frame of mind at times and reality as

9  well and reality is the evidence.  And the evidence

10  in this case was that the only filth that arose from

11  this sequence of events came from the Defendant.

12            If you remember, the very first chat log

13  that the Government introduced into evidence

14  reflected that the undercover agent was in training

15  and had just put on his bio that he was a

16  34-year-old mother of two girls, ages five and

17  three, and he happened to be sitting in the fetish's

18  chatroom when the Defendant initiated contact with

19  the agent, not vice versa.

20            The agent never initiated contact that

21  first time with the Defendant.  It was the Defendant

22  who initiated contact.  And the first words out of

23  his mouth were, "Are you training your girls, Jen?

24  Are you training your girls."  He went on -- and

25  these were, again, not the agent's words; these were

                                                    62

1  the Defendant's words.  "You should start licking

2  them ASAP then just to start and make them lick you,

3  too.  Both are a good age to learn to suck a man,

4  too.  And your five-year-old is ready for anal with

5  a man, too."

6           These are his words.  This was not some

7  fantasy.  This was not some lure or goading of the

8  Defendant.  This was a law enforcement officer just

9  sitting and waiting and what this law enforcement

10  officer found was the Defendant who, in his own

11  words, in unmistakable terms, laid out what his

12  intent was.

13           And if you remember, the evidence

14  reflected a sequence of events that played out over

15  days and weeks in which this kind of talk by the

16  Defendant was repeated over and over even to the

17  point where the Defendant was introduced to a female

18  undercover officer whom he talked to on the phone

19  and repeated this and we played those recordings.

20  And I cannot imagine a more un-entrapping --

21  non-entrapping situation than what was evidenced by

22  what played out over the course of this case.

23           Sure, there is entrapment.  There are

24  issues of entrapment where law enforcement officers

25  approach that line and even in some cases step over

                                                    63

1  it, but there was never even a line in this case, to

2  my amazement.

3           Because, if you remember, even at the very

4  end of all of these conversations where the

5  Defendant is the one who is talking explicitly, not

6  the law enforcement officer, time after time after

7  time they gave him the opportunity to clarify his

8  intent or to retract his words or to say he was just

9  fantasizing or just making believe.  Never once was

10  there a word uttered to that effect.  Everything was

11  uttered to the opposite.

12          All that culminated, if you remember,

13  Your Honor, in the undercover officer, the

14  undercover female officer asking the Defendant not

15  once but twice, "What do you want me to do?"

16          "Bring them," were his responses.  "Bring

17  them."

18          Now, if you could conceive of a more

19  non-entrapable situation, it would be hard to do.

20          All of this arose from the Defendant, his

21  words, calling his own relative to make up a false

22  alibi for his wife, purchasing tickets at the Amtrak

23  Station for not only this person whom he believed

24  was a mother, but for her two young girls.

25          This wasn't goading.  It wasn't luring.

                                                        64

1  It was good police work of uncovering a predator

2  online.

3          And while all of the comments you've heard

4  today, Your Honor, are understandable, I've said to

5  you before in sentencings and I still think it's

6  true that leniency falls on deaf ears without

7  acceptance of responsibility.  We have not heard any

8  acceptance of responsibility.

9         And that evidence that we presented to you

10  today that the Government felt compelled to bring,

11  we were not going to bring a seven-year-old girl up

12  from Florida to testify face-to-face with a

13  Defendant in a sentencing hearing.  And because of

14  that, Your Honor can give that evidence whatever

15  weight he deems appropriate, but I don't believe it

16  would have been appropriate for the Government

17  simply to ignore it.

18         And that evidence, for whatever weight you

19  want to give it, is that this child was subjected to

20  a forensic interview by a social worker at a child

21  advocacy center and that social worker found that

22  sexual abuse was verified, consistent with the words

23  out of the Defendant's own mouth about him abusing

24  young girls.

25         All we have in this case from the


                                                      65


1  beginning, with the exception of this young girl's

2  statements, all we have to reflect on the

3  Defendant's intent are his own actions, his own

4  words.  And those actions and words are

5  unmistakable.

6              I said we weren't going to recommend life

7    because I don't think that that severe of sentence

8    is necessary to adequately reflect the seriousness

9    of an offense or to detour others, but I do think a

10   maximum sentence is appropriate, Your Honor, not

11   only because of the circumstances of the offense,

12   but because of the lack of any recognition of

13   acceptance of responsibility.

14             293 months is an appropriate sentence and

15   a life term of supervised release.  Given the

16   Defendant's financial profile, no fine is

17   recommended.  That's our recommendation, Your Honor.

18   Thank you.

19             THE COURT:  Thank you.  Mr. Sorosky, you

20   may be heard at this time.

21             MR. SOROSKY:  Thank you, Your Honor,

22   Mr. Bass, Mr. Orr.  I don't think it's necessary to

23   repeat the facts of the case.  The trial wasn't that

24   long ago.  I know that Your Honor listened intently

25   and Your Honor is familiar with the facts of the

66

1    case.

2              The sole issue here is sentencing.  Now,

3    if we look at the actual crime the Defendant

4    committed, as I've stated in our position

5    paper -- and I don't mean to be cute when I say

6    this, but it's the truth -- the Defendant committed

7    a talking crime.

8            The conduct that was the crime was the

9    Defendant's words over the internet saying he wanted

10   to do certain things.  It was a talking crime.

11   There was absolutely no physical conduct or act that

12   he did of any type.

13           And there are talking crimes.  There are.

14   For example, in Illinois, the crime of prostitution

15   can be a talking crime.  So if someone -- if a woman

16   agrees -- or a man for that matter, but it's

17   traditionally a woman -- agrees to engage in sexual

18   conduct for money, that's a crime.  That's

19   prostitution.  It's a talking crime, even

20   though -- and traditionally there's an undercover

21   officer posing as someone who is looking for a

22   prostitute.

23           Let's say he meets this woman at a bar.

24   There's some conversation about a dream to have sex

25   for money and the officer arrests the woman.  She

67

1    didn't commit -- she didn't actually participate in

2    a sex act for money, just the mere words; that is

3    sufficient to be a crime.

4            And that's what we have here.  We have a

5    talking crime.  And I think that is a significant

6    factor in this case which calls out for a minimum

7    sentence.

8          Now, I recognize that someone could say,

9    "Oh, he really was going to do all this," but the

10   defense has taken the position that while he

11   committed the talking crime, he truly had no intent

12   to do any of this and that these were just words he

13   was saying or things he was doing because of his

14   condition and his situation in life.

15          And the prosecution has presented here

16   what's commonly known in law school courses as other

17   evidence, evidence other than what was actually in

18   the indictment to try to show how allegedly bad the

19   Defendant was with the activities that allegedly

20   occurred with some young girl who was in foster

21   care, but what we have here is triple hearsay from

22   an out-of-court declarant who in and of herself

23   would not be a reliable witness.

24          We do not have here a situation where

25   let's say a man is convicted of stealing one car and

                                                         68

1    the prosecutor knows, oh, my God, the defense

2    attorney is going to go in front of the judge and

3    say, "Well, he only stole one car, give him a

4    break," so the prosecution brings in evidence that

5    he stole -- we didn't bother to charge him, Judge,

6    but he stole ten other cars, and they have ample

7    proof that he stole ten other cars.

8          That is not the situation here.  It

9    doesn't even come close to that.  In this particular

10   case, we have a talking crime and the Government is

11   attempting to impose a harsh, harsh, harsh sentence

12   by triple hearsay testimony from an out-of-court

13   declarant who in and of herself would not be very

14   reliable and may not even be competent to testify

15   because of her age and this Court cannot consider

16   any of that evidence.

17         And I think this case and perhaps hundreds

18   of others like this case caused the Booker decision

19   to come down because in this case I think the

20   Supreme Court, in its wisdom -- I should say, in the

21   Booker case, the Supreme Court, in its wisdom, felt

22   that cases like this and hundreds of other cases

23   were creating the situation where the Judge's hands

24   or the sentencing Judge's hands were tied in that

25   they were compelled to be mechanical calculating

                                                        69

1    robots and just say, "Well, ladies and gentlemen, we

2    all know the guidelines.  What could I do?  This is

3    the sentence."  And the Supreme Court did not want

4    this type of justice to occur.

5          Now, the Court is very well familiar with

6    the requirements of the statute, which are now the

7    primary and mandatory, to pun, guideline that the

8    Court is supposed to follow and I would ask the

9    Court to follow the statute, consider the fact that

10  the Defendant only committed a talking crime and

11  that he's getting very close to being a senior

12  citizen and, while Mr. Bass says he does not want to

13  impose a life sentence, he's going to give

14  him -- Mr. Bass recommends a sentence which is, in

15  fact, substantially similar to a life sentence by

16  the huge number of months the Government is seeking

17  to incarcerate Mr. Orr.  And it's just wrong.  It's

18  not right.  He didn't do anything that deserves that

19  type of sentence.  Even the minimum sentence is

20  grossly harsh and we would ask Your Honor to be

21  merciful.

22          THE COURT:  Mr. Orr, if you wish to

23  address the Court, you may do it now and Mr. Sorosky

24  will join you at the podium.

25                        EXAMINATION

                                                    70

1  BY MR. SOROSKY:

2      Q.   Will you state your name.

3      A.   Danny W. Orr.

4      Q.   And let me ask you this.  Before you make

5  your general statement, you heard today in court

6  certain testimony involving a young girl who's been

7  identified as L.Y.

8      A.   Yes.

9      Q.   Did you ever have any type of sexual

10  activity with this young girl?

11      A.    Absolutely not.

12      Q.    Did she ever touch your penis or did you

13  ever have her touch your penis or anything of that

14  nature?

15      A.    Absolutely not.

16      Q.    What would you like to say?

17      A.    Well, I do take responsibility for the

18  things that I said and I think I addressed the Court

19  once before about this, that I am . . . I am more

20  than sorry.  The things that I said were absolutely

21  ludicrous and shameful and I just am so ashamed of

22  that and -- but that's, in fact, all I did was talk.

23          THE COURT:  Was the testimony false at the

24  trial about obtaining Amtrak tickets?

25          DEFENDANT ORR:  Well, I wasn't going to

                                                        71

1  bring that up, but since you opened the door,

2  Your Honor, as far as the Amtrak tickets go, when I

3  was talking to the female detective on the phone --

4  the type of person that I am, that's not the person

5  that I was; I'll tell you that right now.

6          But anyway, as my sister-in-law alluded, I

7  am kind of a compassionate person and a caring

8  person and when this detective said that she wanted

9  to come and look around and see if she wanted to

10  move to relocate to that -- to where I lived, I

11  said, "Well, I will send you a ticket on Amtrak,"

12  and she said, "Okay, fine."  She said, "Well, wait a

13  minute."  I said, "What's that?"  And she says,

14  "Well, what about the kids?"  I said, "Well, what

15  about them?"  She said, "I can't -- I don't have

16  anybody to watch them."  She said, "I have to bring

17  them with me.  Can you send two more tickets?"  And

18  that --

19          THE COURT:  What would -- well, I

20  shouldn't cross-examine you and I don't intend to

21  because you didn't take the stand.  I just still

22  don't understand why compassion would want to spend

23  the money to have somebody come to Port Huron.  I

24  mean, that's --

25          DEFENDANT ORR:  She gave me a sob story,

                                                    72

1  Your Honor, that the crime was so bad, she couldn't

2  find a decent job and I said, "Well, there are

3  better jobs here and if you want to come look for a

4  job . . ."

5          And this recording for some reason was

6  never played during the trial.  I don't know why or

7  what happened to it because I know it was recorded.

8  But she asked me, she says, "Well, can you send

9  tickets for these kids?"  She said, "I don't have

10  anybody to watch them," and I said, "Well, you know,

11  are you sure you can't find somebody to watch them?"

12  She said, "No."  I said, "Okay, fine, I'll send two

13  more tickets."  That's why the tickets were sent for

14  the fictional children.

15          THE COURT:  And the same with the hotel

16  room?

17          DEFENDANT ORR:  Well, I mean, if they were

18  going to come -- first off, if things had, in fact,

19  played out, for lack of a better word, she would

20  have never seen me once she got to Port Huron if,

21  you know -- this fictional person, these fictional

22  children would have never seen me.

23          Sure, I got a hotel room for them.  I was

24  going to arrange for a cab to pick them up at the

25  train station, take them to the hotel and that would

73

1  have been it.  She would have got a phone call or a

2  note saying, "Okay, you're here to look for a job,

3  have a nice life."

4          And that's the truth.  I had no intention

5  of even seeing -- I knew in my heart it was wrong

6  and I was not going to do that.  I just wasn't going

7  to do it.  I tried even to call her the day before

8  and cancel the whole thing and obviously being a law

9  enforcement telephone, unless they were waiting for

10  a call from me, it wouldn't be answered.  And it

11  wasn't.  But I did, in fact, attempt to call the day

12  or two days before or the day before -- I don't

13  remember which day it was -- to cancel the whole

14 thing.

15          I was just -- as far as the money, the

16 tickets and the hotel room, I was going to eat it.

17 It didn't matter to me.  I was just going to cancel

18 the whole thing because I knew in my heart that,

19 hey, I had done something wrong.

20          The day that I tried to call to cancel

21 everything, I had not taken any drugs that day and I

22 hadn't been drinking that day and I'm going, "Wow,

23 what did I do?"  And it just played off the way it

24 did.

25          And like I said, that's not the person

74

1 that I am.  That person that was on that internet is

2 not who I am at all.  For 57 years -- I feel like

3 Job here, only the Lord let Satan test Job because

4 of his faith.  Well, for 57 years, the Lord tested

5 me because I didn't have any faith.  (Crying.)

6          I was tried through afflictions,

7 addictions.  I didn't have a real good childhood.  I

8 love my parents dearly now, but I can remember, I

9 didn't get spankings, I got beatings with electric

10 cords and coat hangers.  That stopped when I was

11 about 13 and I have long since forgiven my mother.

12 She had a very, very, very violent temper.  And now

13 she has gone through about 40 surgeries with the

14 same disease that I have.  She's also on the verge

15  of having brain surgery.  But not only have I

16  forgiven her, but I know the Lord has, too.

17          And anyway, to get down to it, I've had

18  several, several -- more than several afflictions

19  and addictions and everything through my life.  I

20  wasn't allowed to date, let alone marry the woman I

21  love.  She's sitting right back there.  (Crying.)

22  Excuse me.

23          THE COURT:  Take your time.

24          DEFENDANT ORR:  Anyhow, I wound up getting

25  married to somebody that my parents had picked out

                                                      75

1  for me.

2          And another one of the trials that I went

3  through is about a year and a half after I did get

4  married, I lost my first son and that started me on

5  the road to depression.  I had to be strong for my

6  first wife and try and uplift her and everything and

7  try and play the real macho He-Man and act like it

8  really didn't bother me a lot that I -- my son had

9  died.

10          And we did wind up having two beautiful

11  children.  I've got a daughter that's 36 I think, 36

12  or 37; my son is two years older than her and they

13  have -- they each have two children.  My daughter

14  has two sons and my son has a son and a daughter, so

15  I've got four grandchildren out in Arizona.

16          Then the next big blow that came along

17    which further led to more and more depression, I

18    spent 13 days in the hospital in the psychiatric

19    ward in Arizona for severe depression and I was on

20    all kinds of -- I don't know what they had me on as

21    far as drugs go, but my daughter and her boyfriend,

22    they wound up getting her pregnant at 16 and at the

23    time I was severely depressed and drinking quite a

24    bit and made one of the biggest mistakes of my life

25    and I made them both go with me down to the Planned

                                                                    76

1    Parenthood Clinic and I made her get an abortion and

2    I didn't think about it much at the time, of course,

3    and as I reflected on it over the years, it just

4    breaks my heart and I regret it so much that I made

5    her do that because that cost me my first

6    grandchild, too.

7          But one thing I can be thankful for is

8    this woman sitting right back here because once I

9    got to the Dewitt County Jail over at Clinton, I

10    called her up about two days or three days before

11    Halloween in 2006 just to tell her good-bye because

12    I was going to take my own life and I already had

13    figured out how to do it in jail and I had no qualms

14    about doing it and I just called her to say good-bye

15    and she talked me out of doing it.

16          She said, "Don't do anything foolish."

17    She says, "I forgive you for what you've done."  She

18    said, "I've loved you always and I still love you."

19    Imagine that.  She said, "I sent you a couple of

20    books yesterday."  She said, "You should be getting

21    them."  She says, "Don't do anything."  She said,

22    "Just read these books."  She made me promise not to

23    take my life.  So I waited and I got the books and I

24    read them and one was on unconditional love and the

25    other one was on forgiveness.

77

1         About three or four days later, on

2    November the 2nd of 2006, I was born again and I had

3    my birthday.  And I know you've heard the term

4    before, "Jailhouse religion."  This isn't jailhouse

5    religion.  This is Jesus Christ, My Savior.  I'm not

6    crying because I'm sad, I'm crying because I'm

7    happy.  He is my Lord.

8         No matter what happens here, this life

9    here on this earth is but a vapor.  I know where I'm

10    going to spend eternity.  No, I don't want to go to

11    jail for an extremely long time, but even if I do,

12    it doesn't matter because I know where I'm going and

13    I know I'm safe.  That's all I have to say.  Thank

14    you.

15         THE COURT:  Thank you, Mr. Orr.  I know

16    the Court Reporter has been going for almost two

17    hours and so we're going to take a ten-minute break

18  so everybody can have a break before one o'clock and

19  then we'll come back and complete the sentencing.

20          THE CLERK:  Judge, the Court Reporter has

21  a 1:15 appointment.

22          THE COURT:  She has a 1:15 appointment.

23  We'll take a recess; we'll be back at 1:30.

24              (Court is in recess.)

25                  12:51 p.m.


                                                        78


1          IN THE UNITED STATES DISTRICT COURT
        FOR THE CENTRAL DISTRICT OF ILLINOIS
2              URBANA DIVISION

3

4          I, JILL NICOLE STEVENS, Certified

5  Shorthand Reporter, Registered Professional Reporter

6  and Notary Public of the State of Illinois, do

7  hereby certify that I reported in shorthand the

8  proceedings had on the sentencing hearing in the

9  above-entitled cause; that I thereafter caused the

10  foregoing to be transcribed by computed-aided

11  transcription, which I hereby certify to be a true

12  and accurate transcript of the proceedings had

13  before the Honorable Chief Judge Michael P.

14  McCuskey, Judge of said Court.

15

16          Dated at Villa Grove, Illinois, this 28th

17  day of May, A.D., 2008.

18

19

20

21  _____
                    Jill Nicole Stevens, Reporter
22

23

24

25


                                                        79



1          IN THE UNITED STATES DISTRICT COURT
       FOR THE CENTRAL DISTRICT OF ILLINOIS
2               URBANA DIVISION

3
   UNITED STATES OF AMERICA,    )
4                               )
                 Plaintiff,     )
5                               )
           -vs-                 )  No. 06-20074
6                               )
   DANNY W. ORR,                )
7                               )
                 Defendant.     )
8

9

10

11

12             TRANSCRIPT OF PROCEEDINGS

13      BEFORE THE HONORABLE MICHAEL P. McCUSKEY

14                  MAY 16, 2008

15                   1:30 P.M.

16

17

18

19

```
20              Shelley Marvin:  CSR# 84-003926

21     Area Wide Reporting Service & Video Conferencing
                    301 West White Street
22              Champaign, Illinois  61820
                     (800) 747-6789
23

24

25
```

                                                            80


```
1                        INDEX

2    APPEARANCES:

3    For the Plaintiff:
              Timothy A. Bass
4             U.S. Attorney
              618 South Sixth Street
5             Springfield, Illinois  62701-1806
              (217) 492-4450
6
     For the Defendant:
7             Sheldon Sorosky
              KAPLAN & SOROSKY, LTD.
8             158 West Erie
              Chicago, Illinois  60610
9             (312) 640-1776

10   Also Present:  Donna Brown, Probation

11

12

13

14

15

16

17

18

19

20
```

21

22

23

24

25

81

1          (Whereupon the proceedings commenced at

2     1:33 P.M.)

3          THE COURT:  This is the United States of

4     America, Plaintiff, versus Danny W. Orr,

5     Defendant, Case No. 06-20074.  It's now

6     approximately 1:35.  We recessed at 12:50 in this

7     case, after starting at 11:00, so that the court

8     reporter could have a break.  And the court

9     reporter indicated that she -- her services were

10    only for this morning.  And we have another court

11    reporter present at this time from the Area Wide

12    Court Reporting Service.  So I'd forgotten that.

13    But actually, the time for the change came

14    appropriately to give court personnel a break and

15    have a short lunch hour before we continued the

16    conclusion of Mr. Orr's sentencing.

17         When we recessed, Mr. Orr had completed

18    his allocution in this case, and the Government

19    had recommended a sentence, the highest sentence

20    under the Advisory Guidelines, of 293 months.  The

21    offense level the Court had previously found was

22    unobjected to by the parties of 38, criminal

23    history 1.  So under the Advisory Sentencing

24    Guidelines, the Defendant faces a sentence of 235

25    to 293 months.

                                                    82

1              The Court wants to reiterate what the

2    Defendant was found guilty of.  In Count I, from

3    on or about July 19, 2006 and continuing to on or

4    about September 11, 2006, in the Central District

5    of Illinois and elsewhere, the Defendant Danny W.

6    Orr used a facility and means of interstate

7    commerce, including internet communications --

8    there's no question in this case, nor is it even

9    denied, that Mr. Orr was on the internet -- to

10    knowingly attempt to persuade, induce, entice or

11    coerce a minor who had not attained the age of 18

12    to engage in sexual activity, for which the

13    Defendant could have been charged with a criminal

14    offense.

15              The evidence in this case was lengthy

16    chat logs which were from a chat room not entitled

17    Fantasies, but a chat room that was entitled

18    Fetishes.  So only people who were interested in

19    fetishes would be in that chat room.  And it's

20    quite clear that Mr. Orr was in that chat room,

21    knew exactly what that chat room was about, and

22    indicated even in his name, Master Core, which

23    would certainly be a dominant name, and indicated

24    in transcripts that were shown to the jury that he

25    didn't want anybody who was just -- didn't mean

                                                                    83

 1    anything wasting his time.

 2              And of course we know that this contact

 3    started on July 19, 2006, the first date in

 4    Count I, and immediately conversation took place

 5    between Mr. Orr and a police officer posing as a

 6    34-year-old female named Jennifer Spaden, with two

 7    minor children, aged 3 and 5.

 8              The screen name was Jen M-O-M-A-N,

 9    JENMOMAN.  While in the chat room, the Defendant,

10    who had the name Master Core 1, contacted Welker

11    through the Yahoo! Instant Messenger.  So this was

12    the Defendant taking the action.  And the language

13    clearly involves what would be a crime, training a

14    12-year-old stepdaughter, which he said he'd been

15    involved with since age 4.

16              Well, while that was -- may have been

17    talk and the training was sexual in nature, we

18    need to look at what ultimately started taking

19    place on July 20, 2006 with Master Core.  "You

20    should start licking them as soon as possible --

21    you should start licking them as soon as possible

22    then, just to start."  The response, "Really?"

23    "Yes, really," said Master Core.  And then Master

24     Core said, "And make them lick you, too."  Then

25     Master Core again said, "They both are a good age

84

1     to learn to suck a man, too."  JENMOMAN says,

2     "Well, I can't help them there, seriously."

3     Master Core, "True."  And then Master Core says,

4     "And your five-year-old is ready for anal with a

5     man, too, and can do that through with -- you can

6     do that through with your fingers."  Master Core

7     says, "Again, just use a good lube like KY."

8     JENMOMAN:  "Really?"  JENMOMAN:  "Even at 5?"

9     Master Core 1:  "Yes."  JENMOMAN:  "We're talking

10    about training them?  What does that all mean?"

11    Master Core:  "Train them to do oral, either woman

12    or man, and take anal and intercourse from a man.

13    Suck and swallow cum.  Teach them to masturbate.

14    Teach them to use toys, like vibes and dildos.

15    And use the toys in you also."

16          There was nothing about that that would

17    show that the person posing on the other line as a

18    34-year-old female with children 3 and 5 was

19    leading Mr. Orr on.  There's no question who

20    Master Core 1 was.  There's no question what his

21    intent is.  And so there was no question after

22    time and time again these things were played, as

23    well as images of child pornography, on his

24    computer.  No question as to what was going on

25    here.  Count I, overwhelming evidence of guilt.

85

1          Count II -- and I was not trying to

2    cross examine Mr. Orr to elicit anything.  I just

3    -- you might say I was tired of hearing this is

4    just talk, all this was was a talking crime.

5    Count II's not a talking crime.  Count II is that

6    on about September 5th, 2006, in the Central

7    District of Illinois and elsewhere, the Defendant

8    Danny W. Orr knowingly and intentionally attempted

9    to persuade, induce, entice and coerce a minor who

10   had not attained the age of 18 to travel in

11   interstate commerce to engage in sexual activity

12   for which the Defendant could have been charged

13   with a criminal offense.

14          Amtrak tickets purchased, hotel rooms

15   discussed and going to be purchased.  The family

16   coming with small children from Decatur.  And

17   today, before the break, Mr. Orr says, "Well, that

18   was just my generosity.  I just wanted to help

19   them come to Port Huron, and that would have been

20   it.  I wouldn't have seen them.  Nothing would

21   have happened.  I would have just been generous."

22          It's not what the jury thought.  It's

23   not what this Court thinks.  Overwhelming evidence

24   of guilt when you look at all of the transcripts.

25   And as he said, he admitted degrading, filthy

1    comments, for which he's sorry.  But it was more

2    than just comments.

3            Now, Mr. Bass put into evidence today

4    what we'd call 404(B) evidence.  And the

5    Government always loves to put their thumb, if not

6    their foot, on the scale.  404(B) would be

7    evidence of other crimes, wrongs or acts which

8    would not be admissible in trial unless the door

9    was open.  Well, here, it wouldn't have come in at

10   trial because Mr. Orr did not take the stand or

11   present any evidence.  But it comes in now at

12   sentencing.  So the Government withdraws the

13   five-level increase and says we're not asking for

14   a life sentence, but then puts it in to ask the

15   Court for a maximum sentence of 293 months.

16   Admissible to show motive, opportunity, intent,

17   preparation, plan, knowledge, identity, absence of

18   mistake.

19           Well, it's quite clear the Government

20   wants to go one step further and, in effect,

21   create a Count III that would have said if you

22   don't believe he intended to do it, these are the

23   facts to show that he's done it before.  Well, if

24   the Court was going to give weight for sentencing

25   to that -- I don't know what kind of private law

87

1    practice and family law Mr. Bass had, but I had 13
2    years and, in doing that 13 years as Public
3    Defender, was appointed many times by the Court as
4    the guardian ad litem of children to make inquiry
5    about this very activity.  And in that 13 years of
6    practice, I know that not all five-year-old
7    children speak the truth because it depends on how
8    they are handled, what questions are shown, what
9    anatomical dolls are shown, and how they are
10   interrogated.  And there is a way of interrogating
11   people that will elicit exactly what you want.
12           We know from the testimony, the child
13   initially didn't admit any wrong conduct on
14   Mr. Orr's part and then later, coincidentally as
15   this case is filed and develops, it comes out.
16           So for the Court to give it weight, I
17   would have wanted to have here today not
18   necessarily the child, but the people who may have
19   elicited the comments so that I could cross
20   examine them as to how they elicited the comments,
21   what questions were asked, which is very important
22   to any juvenile judge, family judge, attorney
23   appointed to represent the children.  Especially
24   when it's hearsay, in effect, on hearsay.
25           Mr. Sorosky improperly objected because

1    the Court can consider this evidence.  It's merely

2    a fact of what weight do I give it.  And in this

3    case, not having more than the allegations, the

4    Court does not give it great weight and,

5    therefore, is not going to consider it during

6    sentencing.

7              So as I said, it's a trial within a

8    trial.  We could have spent days on it before the

9    Court would have come to a final conclusion.  But

10   I certainly did not have enough evidence, either

11   from the statements of the police agency

12   investigation or, of course, Mr. Orr and Fern or

13   denials that this did or could have taken place.

14   So we spent a lot of time on something that the

15   Court does not consider in sentencing today.

16              But the Court does consider the evidence

17   it heard on Count I and Count II at the trial for

18   which it's found overwhelming evidence of guilt,

19   and this is far more than a talking crime.

20   Mr. Orr was clearly not generous.  He was

21   advancing his intent to create a meeting from

22   Decatur to Port Huron.  What would have taken

23   place?  We don't know.  But there's more to a

24   talking crime here.  And that's why Congress has

25   said Count I, you don't use the internet to do

1    this.  And Count II, you don't need to

2    intentionally attempt to persuade, induce, entice

3    or coerce a minor to travel in interstate

4    commerce.

5            Tickets were purchased, the arrangements

6    were made, and the law does not require the

7    Government to have to bring a five-year-old child

8    to Port Huron to see what will happen.  That would

9    have been another crime.  Court I and II in and of

10   themselves are crimes of which there's

11   overwhelming evidence of guilt and for which

12   Mr. Orr will be sentenced today.

13           Sometimes people say this is a

14   victimless crime.  Well, how can it be a

15   victimless crime to entice and induce somebody to

16   come to Port Huron?  We know from the evidence

17   that Mr. Orr had already set up the lie with the

18   relative that he intended to have this happen.  He

19   says by generosity.  That's not true.  This is a

20   chat room for fetish.  This is talk.  It's more

21   than talk, it's criminal.  And it's the kind of

22   talk that leads, as this court and the Congress

23   knows, to more serious illegal acts.

24           So what is the appropriate and

25   reasonable sentence?  The character and history of

90

1    Mr. Orr is taken into consideration as criminal

2    history 1.  Nothing to explain this in prior life.

3    The nature and circumstances of the offense are

4    horrible.  And can we explain it away?  No.  Can

5    we say it happened by accidentally pressing a

6    button?  No.  Can we say it was a mere passing

7    fancy?  No.  Mr. Orr pursued, groomed and became

8    more aggressive each and every day in these

9    conversations, which was sort of amazing he was

10   coming out of the box immediately, which would

11   lead one to conclude this wasn't the first time

12   he'd ever been on the internet.  This wasn't the

13   first time he'd ever been in that fetish chat

14   room.

15            Mr. Bass asked for the maximum sentence

16   under the Advisory Guidelines.  Well, let's see

17   what Congress thinks the maximum sentence should

18   be for what really is maybe the most heinous, and

19   that is to attempt to persuade, induce, entice or

20   coerce a minor under 18 to travel in interstate

21   commerce to engage in sexual activity, which would

22   be a crime.  Congress says that's up to 20 years.

23   Congress has later, very frankly, changed the law

24   with computers.  Now internet communications.  So

25   we do have a higher -- we have a 10-year mandatory

91

1    minimum on Count I and an up to life.

2            The Advisory Guidelines taken together

3    and produce for, in effect, Count I the 235 to 293

4    because for Count II, you can't exceed 240 months.

5    Mr. Bass said that the Government does not seek a

6    life sentence.  Mr. Sorosky says well, 293 months

7    to somebody who's 58-1/2 is pretty close.  And

8    that's probably correct.  The Court does not seek

9    a life sentence, but certainly seeks a sentence

10   here under 18 USC Section 3553(A) that will be

11   appropriate and reasonable.

12          So we look at the Guidelines for

13   guidance, and they're just that.  We look at the

14   statute which says 10 years to life, no more than

15   20 on Count II, and a sentence to reflect the

16   seriousness of the offense.

17          When I started as a judge 20 years ago,

18   this stuff was unheard of.  And now, it's sort of

19   like the trials of Job for this judge to have

20   trial after trial after trial, overwhelming

21   evidence of guilt, no one ever accepting

22   responsibility.  And I remember in this case

23   Mr. Orr wanted to plead guilty before, while the

24   jury was being selected.  And I said, "Would you

25   like your wife present?"  He said, "Yes."  And you

                                                      92


1    could see as soon as Fern entered the room, he was

2    not able to admit it in her presence.  And then we

3    selected the jury and went to trial.  This is not

4    unusual.  Who wants to admit this to their family?

5            I once had a guy tell me from the stand

6    as he brought in all of his relatives, all the way

7    to the grandchildren, "Judge, this is a victimless

8    crime."  No, we know it isn't.  We know it starts

9    on the internet and we know it accelerates to

10   asking people to cross state lines for illegal

11   purposes.  And that's about where we were in Port

12   Huron when the police pulled the plug.

13           So it is a sentence.  It must reflect

14   seriousness of the offense and promote respect for

15   the law.  I don't know when we'll get people off

16   the internet.  We heard from the -- that the

17   Yahoo! Fetish chat room had 300,000 people

18   engaging in this conduct.  Everyone that comes to

19   this court has ultimately been convicted and

20   received a stiff sentence, but it doesn't seem to

21   stop the conduct.  So it must be just punishment

22   to afford adequate deterrents and protect the

23   public, because we know that there are children

24   who are being preyed upon, acted upon, and that

25   there are parents and others who will allow this

93

1    to happen.

2            Must be fair, consistent and

3    determinant.  And I have not in these cases seen

4    fit to give minimum sentences, especially in a

5    case that is as clear and foul as this one.

6              You're right, you were possessed by the

7    devil.  No human full of the love of Jesus would

8    ever talk this way.  So Satan committed the crime

9    with you and Satan must be punished.  Your future,

10   as you said, is in salvation.  Your punishment is

11   for your sins.  And that's why we're here today,

12   render under Caesar what are Caesar's, and these

13   are the laws of the United States that will be

14   imposed.

15             So no, a 10-year sentence here would

16   deprecate the seriousness of this offense.  A

17   293-month sentence, I believe, would be excessive

18   and greater than necessary.  But I do believe that

19   when Mr. Bass asked for a maximum sentence, the

20   place to look is Count II, persuading somebody to

21   come across interstate lines for moral and illegal

22   purposes with a child.  That's what's most

23   egregious:  The Amtrak tickets, the talk, the

24   hotel rooms, come to Port Huron, get a relative to

25   come up with an excuse.  No, that's not

                                                      94

1    generosity; that's a crime.

2              So I believe that the appropriate and

3    reasonable sentence here is the statutory maximum

4    in Count II of 240 months, and that sentence will

5    also be imposed in Count I.  I believe that

6    sentence, considering the time that Mr. Orr has

7    already served, with 85 percent, will afford him

8    an opportunity for life after this sentence.  It

9    is not a death sentence or a life sentence.

10        So in conclusion, pursuant to the

11    Sentencing Reform Act of 1984, it is the judgment

12    of this Court that the Defendant Danny W. Orr is

13    hereby committed to the custody of the Federal

14    Bureau of Prisons for a term of 240 months.  Said

15    term shall consist of 240 months on Count I and

16    240 months on Count II, to be served concurrently.

17        Due to extensive family ties, the Court

18    recommends to the Bureau of Prisons that Mr. Orr

19    be housed in a facility near Port Huron, Michigan,

20    which is capable of providing the Defendant with

21    appropriate medical treatment.  The Court finds

22    that Mr. Orr has been addicted to drugs,

23    pain-killers, for his various physical maladies

24    and recommends to the Bureau of Prisons that he

25    receive intensive and comprehensive drug and

95

1    alcohol rehabilitation while in the Bureau of

2    Prisons.

3        The Court finds -- and this is

4    interesting, this is another factor I didn't

5    mention.  The reason I know, no one could be this

6    generous with somebody they just met over the

7    internet because Mr. Orr does not have the ability

8    to pay a fine, either immediately or through

9    installment payments based on his financial

10    profile, so why would he be generous with money

11    that the family really doesn't have?

12          Upon release from imprisonment, Mr. Orr

13    shall be placed on supervised released for a term

14    of life on Counts I and II, to be served

15    concurrently.

16          Within 72 hours of release from the

17    Federal Bureau of Prisons, Mr. Orr will report in

18    person to the Probation Office in the district to

19    which he's released.  Court finds the Defendant

20    subject to the mandatory drug testing provisions

21    of 18 United States Code, Section 3583(D).  orders

22    him to submit to one drug test within 15 days

23    after being placed on supervision, two drug tests

24    thereafter as directed by the U.S. Probation

25    Office.

96

1          Pursuant to United States Code 42

2    Section 14135(A), Mr. Orr will cooperate in

3    collection of DNA as directed by the Probation

4    Office.  In addition to the standard conditions of

5    supervision, Mr. Orr will comply with the

6    following special conditions:  Shall register with

7    the state sex offender registration agency in any

8 state where he resides, is employed, carries on a

9 vocation, or as directed by the Probation Office.

10   You shall neither possess, nor have

11 under your control any material, legal or illegal,

12 that contains nudity or that depicts or alludes to

13 sexual activity or depicts sexually arousing

14 material.

15   I recently had a man, I think he's in

16 his 70s -- Donna Brown would know better, maybe

17 Carmen -- where he possessed videos of young

18 girls.  He somehow thought this meant minor

19 children.  I read it to him again.  I said this is

20 exactly what I said to you when I sentenced you.

21 You shall neither possess, nor have under your

22 control any material, legal or illegal, Playboy or

23 otherwise, that contains nudity or that depicts or

24 alludes to sexual activity or depicts sexually

25 arousing material.  So he was revoked on his

97

1 supervised released and sent back to prison in his

2 70s.

3   This includes, but is not limited to any

4 material obtained through access to any computer

5 and/or any communication device, including a

6 computer and/or communication device for

7 employment purposes or any material linked to a

8 computer or communication device, access or use.

9           You shall not receive or transmit any

10   sexually arousing material, including child

11   pornography -- of course, that means adult

12   pornography or adult nudity -- by the internet nor

13   visit any website, including any chat rooms or

14   bulletin boards, contain any sexually arousing

15   material, including child pornography or adult

16   pornography.

17           You shall install a filtering software

18   on any computer you possess or use which will

19   monitor and block access to sexually-oriented

20   websites.  You shall allow the Probation Office

21   unannounced access to any computer you possess or

22   use to verify that the filtering software is

23   functional.  You'll pay for the cost of the

24   filtering software, as directed by the Probation

25   Office.

98

1           You will allow the Probation Office to

2    conduct periodic unannounced examinations of your

3    computer equipment and/or any communication

4    device, including, but not limited to, cellular

5    telephones and residence.  This may include

6    retrieval and copying of all data from your

7    computer to ensure compliance with this condition

8    and/or removal of such equipment for the purpose

9    of conducting a more thorough investigation.

10              You shall participate in a sex offender

11      treatment program as deemed necessary by the

12      Probation Office.  You shall pay for these

13      services as directed by the Probation Office.

14      You'll submit to psychological testing, including

15      polygraph testing, which may be part of a sex

16      offender treatment program as directed by the

17      U.S. Probation Office, and you'll pay for those

18      services.

19              You will have no contact with any person

20      under the age of 18, except in the presence of a

21      responsible adult who's aware of the nature of

22      your background and current offense and who has

23      been approved by the Probation Office.

24              You will refrain from any use of

25      alcohol, and you will not purchase, possess, use,

                                                    99


1      distribute or administer any controlled substance

2      or periphernalia related to any controlled

3      substance, except as prescribed by a physician.

4              You shall, at the direction of the

5      Probation Office, participate in a program of

6      substance abuse testing, including not more than

7      six tests per month, to determine whether you used

8      controlled substances and/or alcohol.  You shall

9      pay for these services as directed by the

10      Probation Office.

11          You shall participate in psychiatric

12   services under a program of mental health

13   counseling treatment as directed by the Probation

14   Office.  You shall take any and all prescribed

15   medications as directed by the treatment

16   providers.  You shall pay for these services as

17   directed by the Probation Office.

18          You shall not own, purchase or possess

19   firearms, ammunition or other dangerous weapon.

20   Further ordered that you'll pay a special

21   assessment to the United States.

22          Following the jury verdict and the Court

23   agency's denial of your motion for a new trial,

24   you have the right to appeal all of the findings,

25   judgment and sentence of this Court.  You may do

                                                    100


 1   that in one of three ways:  First, you may file a

 2   Notice of Appeal with the clerk's office here in

 3   Urbana.  Second, you may file a request directing

 4   the clerk's office to prepare a Notice of Appeal

 5   on your behalf.  Or third, you may ask Mr. Sorosky

 6   and direct him to file a Notice of Appeal on your

 7   behalf.  Any of those three methods must be

 8   completed within 10 days to appeal your sentence.

 9          Do you have any questions -- sentence,

10   trial, all of the proceedings in the case are

11   available to be appealed.  Do you have any

12   questions about your appeal rights, Mr. Orr?

13          THE DEFENDANT:  No.

14          THE COURT:  Anything further, Ms. Coats?

15          MS. COATS:  No, Your Honor.

16          THE COURT:  Anything further from the

17   Government?

18          MR. BASS:  No, sir.

19          THE COURT:  Anything further,

20   Mr. Sorosky?

21          MR. SOROSKY:  First, Mr. Orr would

22   request that the Clerk of the Court file an appeal

23   form and would ask that the Court would appoint a

24   lawyer to represent him on appeal.

25          THE COURT:  Well, I can't do the second.

                                                    101


1    I can direct the Clerk to file a Notice of Appeal.

2    You will have to seek leave from the 7th Circuit

3    Court of Appeals to withdraw and have an attorney

4    appointed based on Mr. Orr's indigency.  Once the

5    Notice of Appeal is filed, I lose jurisdiction.

6    So the Notice of Appeal's filed.  You'll have to

7    take up being relieved of your duties with the 7th

8    Circuit.

9           So that's all for the record.

10   Defendant's remanded to the custody of the United

11   States Marshall to be transported to the Federal

12   Bureau of Prisons, given credit for time served.

13    We'll proceed with the next case.

14              (Whereupon the proceedings concluded at

15    2:04 P.M.)

16

17

18

19

20

21

22

23

24

25

102

1    STATE OF ILLINOIS )
                       ) SS
2    COUNTY OF McLEAN  )

3
        I, SHELLEY MARVIN, CRR, RPR, and CSR in and
4    for the State of Illinois, do hereby certify that
     the foregoing proceeding was taken on the 16th day
5    of May, 2008.

6        That said proceeding was taken down in
     stenograph notes, afterwards reduced to
7    typewriting by me, and is a true and accurate
     transcription of the testimony.
8
         I do hereby certify that I am a disinterested
9    person in this cause of action; that I am not a
     relative of any party or any attorney of record in
10   this cause, or an attorney for any party herein,
     or otherwise interested in the event of this
11   action, and am not in the employ of the attorneys
     for either party.
12
         IN WITNESS WHEREOF, I have hereunto set my
13   hand this 23rd day of May, 2008.

14

15

16

17
                    SHELLEY MARVIN, RPR, CRR, CSR
18

19

20

21

22

23

24

25